**MORRISON et al. v. REECE. (No. 6800.)**

(Court of Civil Appeals of Texas. Austin. Nov. 5, 1924.)

1. **Pleading ⬾34(3)—Contract for payment of broker's commission held sufficiently alleged, under rule as to favorable intendments.**

Petition, in broker's action for commission for procuring purchaser of oil lease, *held* sufficient, as against general exception, under rule 18 for district and county courts, to allege contract by, or under authority of, and acceptable to, all defendants.

2. **Mines and minerals ⬾101—Verbal agreement between joint owners of oil lease held superseded by written trust agreement requiring assent of all to sales price.**

Verbal agreement, between three joint owners of oil lease to sell when they could double their money, *held* superseded by subsequent written trust agreement requiring assent of all to sales price.

3. **Tenancy in common ⬾55(6)—Testimony, as to conversations and transactions with one of three joint owners of oil lease, held inadmissible as to co-owner in action for commission.**

Broker's testimony, as to conversations and transactions with one of three joint owners of oil lease, *held* inadmissible as to co-owner in action for commission for procuring purchaser of lease, in absence of evidence, other than written trust agreement requiring assent of all joint owners to sale price, that such owner had authority to bind co-owner.

4. **Brokers ⬾84(2)—Must show proposed purchaser's ability to carry out contract, owner declining to sell.**

Broker, suing for commissions for procuring purchaser, to whom owner declines to sell, must show that proposed purchaser was able to carry out contract.

5. **Brokers ⬾88(3)—Issue of purchaser's ability to carry out contract held not raised by evidence.**

Evidence that proposed purchaser of oil lease drew conditional draft on himself as trustee, which was delivered by broker to owner, who was informed by bank on which drawn that it would be paid if presented that day, *held* insufficient to raise issue of purchaser's ability to carry out contract.

6. **Brokers ⬾74—Joint owners of realty each liable for full amount of commissions on breach of joint contract employing broker to sell entire property.**

Joint owners of undivided interests in realty are each liable, on breach of joint contract employing broker to sell entire property, for full amount of commissions, contract being joint and several, and liability not affected by interest of each in subject-matter of contract.

7. **Appeal and error ⬾1173(2)—Judgment against party not appealing not disturbed.**

Judgment against party not appealing will not be disturbed.

Appeal from District Court, Tarrant County; Ben M. Terrell, Judge.

Action by C. H. Reece against H. H. Morrison and others. Judgment for plaintiff, and defendants Morrison and another appeal. Reversed and remanded, as to appellants.

J. M. Carter, H. T. Cooper, and John S. Morris, all of Fort Worth, for appellants.

Phillips, Trammell & Chizum and Evan S. McCord, all of Fort Worth, for appellee.

McCLENDON, C. J. C. H. Reece, the appellee, brought this suit against H. H. Morrison, R. D. Logan, and Hugh Martin, for a broker's commission for having procured a purchaser ready, able, and willing to buy a certain oil lease from defendants at a stipulated price. There was a trial of the case to a jury upon special issues, and upon their answers judgment was rendered in favor of Reece for $3,420, besides interest and costs. From this judgment, Morrison and Logan have appealed.

Appellants urge ten propositions, which may be reduced to six as follows: (1) That defendants' general demurrer should have been sustained because plaintiff's petition "fails to allege that the terms of the sale procured by him as a broker were approved and consented to by all of the co-owners." (2) That the trial court erroneously permitted plaintiff to testify to conversations and agreements between himself and defendant Martin, because the evidence fails to show that Morrison and Logan ever ratified such conversations and agreements. (3) That the testimony fails to show that defendant Logan ever agreed to the agency, and therefore the judgment was erroneously rendered against him. (4) That the evidence was not sufficient to support a finding that the purchaser alleged to have been procured by plaintiff had the ability to carry out the contract. (5) That the defendants, being joint owners of the lease, were only liable each for one-third of the amount of the commissions in any event. (6) That the court should have granted a new trial upon the issue made by defendants of newly discovered evidence.

Since we have reached the conclusion that the cause must be reversed, it is not necessary to consider the proposition relating to newly discovered evidence. So much of the pleadings and evidence as relate to the above propositions may be summarized as follows:

Plaintiff alleged that defendants were joint owners of an oil and gas lease on 34.2 acres in Limestone county; that the lease was held in the name of defendant Morrison, but each defendant was authorized to sell the lease "upon terms agreed to by all of them, and that upon such sale the defendant Morrison should make a valid assignment of said lease for the benefit of all said defendants"; that

on October 19, 1921, defendants, acting through defendant Martin, listed the lease with plaintiff for sale at $200 per acre net, thereby, in effect, agreeing to allow plaintiff as commission all above the net price he might obtain for the lease; that on October 21, 1921, plaintiff sold the lease to A. C. Page, a purchaser ready, willing, and able to purchase same, and who agreed to purchase same from defendants at the price of $350 an acre; that plaintiff agreed with defendants, acting through Martin, that he would turn over to them $250 an acre, and retain as his commission $100 an acre, "which proposition was acceptable to defendants, acting by and through the defendant Hugh Martin." Plaintiff also alleged that the defendants, acting through Martin, entered into a contract with Page to sell the lease at $350 an acre, and accepted Page as a purchaser, and contracted and agreed to sell Page the lease for said amount. The plaintiff alleged a subsequent refusal by defendants to make the sale.

The legal title to the lease was held by Morrison in trust for the other two defendants, upon an agreement, which, among other things, provided the following:

"It is further understood and agreed by and between the parties hereto that each of said parties may sell said lease at a price, and upon such terms, as are agreed to by all the parties hereto, and if the said lease shall be sold, that the said H. H. Morrison shall make a valid assignment of said lease for the benefit and use of all said parties as their respective interests appear as set out in this contract."

The evidence showed that prior to the time the negotiations were entered into upon which the suit was predicated, Morrison had given to Reece an option to purchase 20 acres out of the lease, which option had expired. Reece testified in substance: That on October 21, 1921, he had a conversation with Morrison and Martin in which they agreed that he could sell the lease for $220 an acre net, and he could have as his commission all he realized above that figure. That in three or four days he found Mr. Page, who agreed to purchase the lease for $350 an acre, and Page gave a draft for $2,000, which read as follows:

"The Fort Worth National Bank:

"Fort Worth, Texas, Oct. 25, 1921.

"On approval of title $2,000 pay to the order of the Fort Worth National Bank two thousand 00/100 dollars, value received, and charge to the account of, with exchange, A. C. Page, trustee, First National Bank, Iowa Park, Texas.

"[Signed] A. C. Page."

That he then communicated with Martin, delivered him the draft, and told him he would take $100 an acre for his commissions, and let the owners have $250 an acre net. That Martin said: "Everything is satisfactory, Mr. Reece." That Martin gave him a

contract to take to Morrison at Mexia for his signature. That he went to Mexia the next day or day after, and, to quote his testimony:

"I delivered the contract to Mr. Morrison in Mexia; I met him in the Commerce Hotel. I told Mr. Morrison at that time that a trade had been made, and that Mr. Martin and Mr. Page had made a contract, and I was delivering these papers to him to be delivered to the attorney for Mr. Page with the abstract. I told him who the attorney was; I had a slip of paper with the name of the attorneys on it; they were attorneys at Mexia. I gave Mr. Morrison the papers and he didn't say anything at that time about delivering the papers. I don't think that Mr. Morrison ever delivered the papers to the lawyers whose names I had on that slip of paper. I learned from Mr. Morrison that he had not delivered the papers to the attorneys."

With reference to Page's ability to carry out the contract, he testified:

"I don't know where Mr. Page is now; I have seen him since, however. I saw him a couple of times at Mexia. It has been just about a year since I saw Mr. Page. That night I made inquiries of Mr. Medill as to the solvency of Mr. Page. Mr. Medill was with the North Texas Supply Company at that time. As to whether Mr. Page was solvent or insolvent, I will state that that was turned over to Mr. Martin. I only made inquiry through Mr. Medill as to whether Mr. Page was able to pay for this lease. Mr. Medill was there at the time, and I also had Mr. Martin to call up the bank. I instructed Mr. Martin to call the bank and see."

Defendant Martin testified:

"When we bought this lease, I thought that we were paying $110 an acre for it, that was my understanding of the matter. We three agreed to sell the lease when we could double our money; that was the understanding and agreement that we all had; we all agreed to sell the lease when we could double our money on it; all the parties to the contract, dated October 17, 1921, agreed to that, that is, Mr. Morrison, Mr. Logan, and myself. We agreed to that before we bought the lease; at the time the contract dated October 17, 1921, was entered into that was the understanding; it was just a gentleman's agreement that at any time we could double our money we would take it."

He corroborated Reece with reference to delivery of the draft to him, and his closing the agreement on the basis of $350 an acre, $250 net to the owners, and $100 an acre to Reece. With reference to the check he testified:

"The next morning I called the bank and asked if A. C. Page's check was good for $2,000. I called up the bank at Iowa Park, and they told me if it was presented that day, it would be, and they asked me who signed it, and I couldn't ever make him understand who signed it, and it was signed by A. C. Page, trustee of some fund, and he said the trustee account was good for $5,000 or $50,000, I couldn't quite understand it; he said the check

would be paid if it was there that day, but he wouldn't hold it, so I called Mr. Logan on the phone and told him the conversation—I made a mistake—I called Mr. Morrison on the phone and told him the conversation. I said I called Mr. Logan, but I meant Mr. Morrison. I told Mr. Morrison that I had sold that piece of property through an agent, Mr. Reece, for $250 per acre net to us, and that Mr. Reece would be down there with the contract, and that I had the $2,000 in my hands, that is, in the way of a draft, and the draft would be honored if it was put in; if he asked who bought it, I don't remember; I don't remember whether he asked who bought it or not, and in the next conversation I had, Mr. Morrison called me and asked me did I know who I sold it to, and I told him I sold it to a Mr. Page, and he said, 'Did you know that's the man that bought it once before?' He asked me if I knew that he was the man that bought it once before, and I told him no, that I didn't know anything about it, and he told me then of three or four forfeits, that other people wanted to buy it, and I told him that they came too late, that I sold it first, and I asked him what he was to get, and he would not tell me; Mr. Morrison wouldn't tell me what he was to get, and we had some words over the phone, and Mr. Reece came back and told me he would not deliver it, and I told Mr. Reece, I said, 'Reece, he has got to deliver it; I have as much right to sell it as any one,' and I told him he would have to deliver it. Later on Morrison called me up and told me he could get a great deal more money for the stuff; that is, in four or five days he called me up and told me that he could get a great deal more than the $250 an acre."

[1] Appellants' proposition that the petition was subject to a general demurrer is manifestly without merit. Rule 18 for district and county courts provides that in passing upon the sufficiency of a petition as against a general exception, every reasonable intendment arising upon the pleadings excepted to shall be indulged in favor of its sufficiency. We think there can be no question but that the petition sufficiently alleges a contract made by all the defendants or under their authority, and that the terms of the contract were acceptable and therefore agreed to by all the defendants. This proposition is, therefore, overruled.

[2, 3] The second and third propositions will be considered together. That the evidence was sufficient to warrant a finding that Morrison himself agreed to the terms of the commission contract is hardly open to question.

In the absence of some evidence that Martin had authority to bind Logan, the testimony of Reece regarding conversations and transactions with Martin was not admissible as to Logan. The verbal "gentleman's agreement," testified to by Martin, to the effect that the three joint owners agreed that they would sell when they could double their money, was made prior to the written trust agreement which required the assent of all to the sales price, and was therefore superseded by the

266 S.W.—52

trust agreement. The relation of the parties as joint owners of the lease did not of itself create the relation of agency among the joint owners. The trust agreement created no agency further than to sell the interest of Logan at a price to which he might agree; and aside from that agreement there is no testimony in the record from which it can be inferred that either Martin or Morrison had authority to bind him, or that he ratified the contract which they had made. We sustain as to Logan the second and third propositions above.

[4] We also sustain the fourth proposition above to the effect that the evidence was not sufficient to support a finding that Page had the ability to carry out the contract. It is well settled in this and other jurisdictions, that where a broker is employed to sell property and the owner declines to make the sale to a purchaser procured by the broker, the burden is on the latter, in a suit for his commissions, to show that the proposed purchaser was able to carry out the contract. Brackenridge v. Claridge, 91 Tex. 527, 44 S. W. 819, 43 L. R. A. 593; 4 Ruling Case Law, p. 308; 9 C. J., p. 644.

[5] There is no evidence to support a finding that Morrison or Logan ever accepted Page as a purchaser, or were willing to consummate a trade with him; nor will the evidence support a finding that Martin was authorized to bind Morrison or Logan in accepting Page as a purchaser. The fact that Page drew a conditional draft upon himself as trustee; that this draft was delivered by Reece to Martin; and that Martin telephoned to the bank on which the draft was drawn and was informed that if the draft was presented that day it would be paid, was not sufficient evidence, in so far as Morrison and Logan were concerned, to raise the issue of Page's ability to carry out the contract.

[6] The fifth proposition is overruled, because it states an incorrect principle of law. The authorities cited by appellants in support of this proposition are all cases which deal with the rights of a joint owner of real estate with reference to a trespass committed upon the joint property, and have no bearing upon the question here presented which concerns a joint contract made by owners of undivided interests in real property employing a broker to make a sale of the entire property. All of the authorities which we have been able to find upon this subject are to the effect that, in such a contract, each of the joint owners is liable in case of its breach for the full amount of the commissions. In other words, the contract is held to be joint and several, and liability is not affected by the interest each person may have in the subject-matter of the contract. Baum v. McAfee, 59 Tex. Civ. App. 55, 125 S. W. 984; Babcock v. Glover (Tex. Civ. App.) 174 S. W. 710 (writ of error refused); McGill v. Pressley, 62 Ind. 193.

·[7] For the errors pointed out, the trial court's judgment against Morrison and Logan is reversed, and the cause remanded to that court for a new trial. Martin not having appealed, the judgment against him is not disturbed.

Reversed and remanded.