230 F.2d 49
 56 A.L.R.2d 1
 Coy BURNETT and Mel Dar Corporation, Appellants,
v.
Ireland GRAVES, J. Chrys Dougherty and Joe R. Greenhill,
individually and as members of partnership of
Graves, Dougherty Greenhill et al., Appellees.
 No. 15656.
 United States Court of Appeals Fifth Circuit.
 Feb. 13, 1956.
Rehearing Denied March 8, 1956.
 
 R. L. House, House, Mercer & House, San Antonio, Tex., Enright & Elliott, Los Angeles, Cal., for appellants.
 John W. Stayton, Black & Stayton, Austin, Tex., for appellees.
 Before BORAH and BROWN, Circuit Judges, and WRIGHT, District Judge.
 BROWN, Circuit Judge.
 
 
 1
 Having lost, then won, Burnett v. Mar-Tex Realization Corp., Tex.Civ.App., 250 S.W.2d 612, Burnett and his family corporation, Mel Dar Corporation now appeal from the judgment entered on a jury verdict awarding $80,000 (plus $5,000 attorneys' fees) to their attorneys[1] for their successful reversal on appeal.
 
 
 2
 The nature of that litigation[2] and its intrinsic merit is now of secondary importance. But even the briefest consideration of it is convincing that it was an important case in which the stakes were high presenting difficult questions challenging the resourceful ingenuity of skilled advocates, and the battle pressed without quarter by leading protagonists in the field of Texas Oil & Gas Law. Not unnaturally the client, vindicated finally in the rightness of his cause, asserts that what transpired was always inevitable and what was simple did not, merely by adverse verdict and judgment, become complex. The attorneys, pointing to the irrefutable proof of an adverse judgment understandably assert that nothing is so uncertain as a jury verdict or a judge's decision, so that an appeal from an adverse judgment suffered at the hands of counsel since displaced by clients, deserves the descriptive 'difficult and complex' and all of the diligent skill which that implies.
 
 
 3
 A threshold procedural point in the judgment against Burnett, personally, is urged with great vigor. Jurisdiction over Burnett in the case, filed in the state court and removed for diversity by defendants, was obtained by Attachment, art. 275 et seq., Rev.Civ.Stat. of Texas, Texas Rules of Civil Procedure 592 et seq. The plaintiffs' Statutory Attachment Bond had Aetna Casualty & Surety Company as a single corporate surety instead of two sureties as literally required by art. 279.[3] Claiming that this noncompliance would have voided the service in a state court, East & West Texas Lumber Co. v. Warren & Son, 78 Tex. 318, 14 S.W. 783; 5 Tex.Jur. 214, § 47; Citizens National Bank of Godley v. Pollard, Tex.Civ.App., 31 S.W.2d 508; Burnett insists that the Federal Court, on proper motion as made here, must to the same. Hisel v. Chrysler Corporation, D.C.W.D.Mo., 90 F.Supp. 655. Appellees meet this head-on relying on arts. 7.01, 7.02, Texas Insurance Code, V.A.T.S., as authorizing a single, corporate surety.[4]
 
 
 4
 We agree. The purpose is plainly evident: recognizing both the business world's well-founded apprehension over the frequently unpredictable liabilities from serving as personal surety and the widespread growth of reputable, financially responsible insurance and related corporations providing bonds and guarantees for compensation, the legislature meant to, and did, determine that whenever and wherever surety bonds were required, a single[5] corporate surety would comply. It was not the repeal, express or implied, of a special by a general act, cf. Sam Bassett Lumber Co. v. City of Houston, 145 Tex. 492, 198 S.W.2d 879; 39 Tex.Jur. 149, 150, § 81; Jefferson County v. Board of County & District Road Indebtedness, 143 Tex. 99, 182 S.W.2d 908; it was the express declaration of an overriding policy, stated in sweeping and emphatic terms, to bring this phase of the judicial and governmental machinery in harmony with modern business developments. McCaskey Register Co. v. Gooch, Tex.Civ.App., 31 S.W.2d 324; International-G.N. Ry. Co. v. Smith, Tex.Civ.App., 269 S.W. 886, (error dismissed); Commonwealth of Massachusetts v. United North & South Development Co., 140 Tex. 417, 421, 168 S.W.2d 226, 228.
 
 
 5
 Mel Dar Corporation likewise insists that there were no services rendered for it, and consequently it should be exonerated without further inquiry. We do not agree. Mel Dar was a party in the appeal proceedings, and its interests were placed in Appellees' hands for full protection. It had a great deal at stake. If Mar-Tex won, all Mel Dar had was a recovery of $513,000 as good faith development costs, and the working interests which it had under the lease from Burnett would be lost altogether. That Burnett's name was nearly always singled out in the briefs, or the emphasis was on him as the moving figure detracts none from Mel Dar's substantial financial interests successfully preserved by the appeal. Moreover, in the long negotiations over the disputed fees, it was Mel Dar's check for $15,000 which was twice tendered to appellees. All of this evidence was ample to permit the jury finding that services of value to Mel Dar were rendered imposing on it the obligation to pay a reasonable fee. See Robert v. Goldman, Mo.App., 229 S.W. 55; International & G.N. Ry. Co. v. Clark, 81 Tex. 48, 16 S.W. 631; Baum v. McAfee, Tex.Civ.App., 125 S.W. 984; Morrison v. Reece, Tex.Civ.App., 266 S.W. 815; Babcock v. Glover, Tex.Civ.App., 174 S.W. 710 (error refused).
 
 
 6
 This brings us then to the only real question of substance-- whether the jury verdict for $80,000 was reasonable or so excessive as to be without foundation. In assaying this, it must be remembered that we are dealing with a verdict of a jury and having himself demanded one, Burnett cannot complain that a jury might have been more liberal than would a judge. We test this verdict as we would any other and, finding ample evidence to support it, approve it as would a Texas Court, Hirsch v. Dearing, Tex.Civ.App., 151 S.W.2d 949; Southland Life Ins. Co. v. Norton, Tex.Com.App., 5 S.W.2d 767. We decline, if we could, Sunray Oil Corp. v. Allbritton, 5 Cir., 187 F.2d 475, rehearing, 5 Cir., 188 F.2d 751; Wright v. Paramount-Richards Theatres, 5 Cir., 198 F.2d 303, any more than would a Texas court, to disregard the jury verdict and retry the claim or arrive at any independent judgment. Cf. Campbell v. Green, 5 Cir., 112 F.2d 143.
 
 
 7
 The trial with its hundreds of pages of testimony was concerned primarily with the value of the services performed. This involved two principal facets-- the nature of the litigation and the money value of its fruits. On both, there was an abundance of convincing, trustworthy evidence. On the first, some of the outstanding advocates[6] of the Texas Bar, familiar with the problems of Texas Oil & Gas Law, accustomed to handling large and important cases, collecting imposing fees, familiar from study of the briefs and records in the appeal case, and advised through hypothetical assumptions on dollar values, testifying to fees considerably in excess of that finally fixed, characterized this litigation as difficult, complex, uncertain, fraught with much danger, and the handling of it by appellees as reflecting skillful ingenuity. Weighing heavily in their estimates was the acknowledged capacity of formidable adversaries with their known repute as aggressive, vigorous, tenacious fighters at the Bar.
 
 
 8
 These experts, as well as several of the appellee attorneys detailed[7] the underlying reasons why the case was deemed difficult and complex. That this inevitably put laymen, the jurors, in judgment upon intricate, abstruse legal theories, weighing the stratagems of articulate craftsmen, determining whether lawyers had, in fact, or ought to have, labored[8] so long or written so much was, of course, the unavoidable consequence of demanding a jury. There was an overwhelming body of evidence containing intrinsic reliability that, starting as they did with a case lost by another, only the most diligent, plodding, thorough, persistent research, drafting and redrafting, preparing and amending briefs, counterbriefs, reply briefs, would satisfy the high demands of professional diligence.
 
 
 9
 The money value of the fruits of victory was likewise established with substantial evidence. If Mar-Tex won, Burnett and his company, Mel Dar Corporation, would lose the value of the 60% working interest. Testimony from sources qualified to fix the value of oil reserves, after deducting the costs of development and determining the present value of operating profit on an 8% discount factor, established a market value for this working interest in excess of $2,000,000. Burnett and his experts, to be sure, put the value at much less based on factors and differentials which the jury, under the evidence, was permitted to, and apparently did, reject. Even assuming that market value would require a deduction of the total of income taxes[9] payable on revenues produced from the property whether owned by an individual or a corporation, the evidence showed the value to a corporation was not less than $1,336,781 and for an individual $661,344. The value in any case was substantial and the jury had ample basis for finding a market value for which the property could and would be sold, at a figure as high as $2,000,000.
 
 
 10
 A jury was chosen as the instrument to determine what lawyers did, what they ought to have done, and what the value of those activities was in economic terms to the clients Burnett and Mel Dar. Under instructions submitting the proper standards[10] with a wealth of persuasive, acceptable testimony, they have fixed it. It is reasonable. It is legal. It is approved.
 
 
 11
 There is no merit whatever in the contention that the value of the services of each of the attorneys who worked on the case should have been submitted for separate determination by the jury. The defendants are fully protected by paying all with the apportionment left amongst themselves. And to have cut it up should have been an unrealistic disregard of the actual engagement. Judge Graves was employed as the over-all leader and director. All others were to work with and under his command, and this, Burnett, more than anyone else, fully realized.[11] The successful appeal was handled in fact by all of the lawyers working together as a team. The value to the client was the result of the total process. What each contributed was really of little tangible value apart from its position in the total effort. It was in fact a group of lawyers working together for two clients in a common cause, exposed to common perils and reaping a mutual reward. What was in fact common, the law may treat the same.
 
 
 12
 Raised in various ways, requests for submission of special charges and motions, are the contentions that somehow appellees were estopped to charge more than $15,000, claim fees on any basis other than the per diem charged in other cases being handled for Burnett, breached some duty in not informing Burnett at the outset of the engagement what the fee would be, and, by failing to keep detailed time records, had lost the right to claim a substantial fee. None has any merit.
 
 
 13
 There is no evidence which raises even a suspicion of unprofessional conduct or breach of their highest duty as counsel. To claim a large fee which a jury on ample evidence finds to be reasonable does not retrospectively impose a burden on the attorney to have pointed out at the beginning that the fee might ultimately be large. Burnett's letter, pressed so heavily on us, written within a month of the engagement, discussing a $15,000 fee related to the good faith improvement claim just completed and expressed the idea that a like fee would be payable on the 'contract-no contract' suit if no appeal were needed. This was no representation as to what would be due if an appeal were necessary, nor did it put on the attorneys the duty of indicating that or any other sum. So far as these bore generally on the value of services rendered, the jury was the judge. None presented a matter for special instruction, much less peremptory direction.
 
 
 14
 While the matter is not at all certain, we think that, under the circumstances, interest on the $5,000 allowed for appellees' attorneys ought to commence on the date of judgment, February 24, 1955, and not the date of the demand, March 10, 1954, fixing the interest on the $80,000 adjudged. See, Peoples Savings Bank v. Marrs, Tex.Civ.App., 206 S.W. 847; American Nat. Ins. Co. v. Ellington, Tex.Civ.App., 97 S.W.2d 983; Kramer v. Wilson, Tex.Civ.App., 226 S.W.2d 675 (N.R.E.); Powell v. Hamilton, Tex.Civ.App., 197 S.W.2d 540; cf. Johnson v. Universal Life & Accident Ins. Co., Tex.Com.App., 127 Tex. 435, 94 S.W.2d 1145. The judgment will be modified accordingly but in view of the very small reduction in relation to the balance affirmed, and the evident certainty that the appeal on the wide front would have been taken in any case, all costs will be taxed against appellants.
 
 
 15
 Modified, and as modified, affirmed.
 
 
 
 [1]
 The verdict and judgment is in a lump sum, without apportionment, for the firm of Graves, Dougherty and Greenhill, who acted as lead counsel in charge of the appeal; Messrs. Kleberg, Mobley, Lockett & Weil of Corpus Christi; and Gaynor Kendall employed specially by Graves with Burnett's consent as a briefing assistant
 
 
 [2]
 Burnett, a lawyer and business man, lived in Los Angeles, California, and owned Shamrock Island in Nueces County. Mar-Tex was anxious to secure an oil and gas lease upon this island. J. Cleo Thompson, an attorney of Dallas, president of Mar-Tex and John D. Wheeler of San Antonio, the then attorney for Burnett, after some preliminary negotiations in Texas, conferred in Los Angeles with Burnett on February 23, 1950. After almost two days' continuous negotiation, drafting and redrafting of a contract for this particular transaction and not a mere adaptation of printed, standard lease forms, the lease was finally drafted, signed and acknowledged by Burnett. This executed lease was turned over to Thompson under a letter signed by Burnett stating that the executed copies of the lease were placed in his hands for the sole purpose of securing their execution by Mar-Tex and turning them over to Burnett's attorney Wheeler. Simultaneously, two letters were addressed by Burnett, one to Wheeler stating that when he received the copies of the oil and gas lease executed by Mar-Tex and the $100,000 performance guarantee had been deposited by Mar-Tex with the Frost National Bank as escrow agent, he would be 'authorized to make delivery to Max-Tex * * * of the said lease * * *'; and, the other to the Bank instructing them on the holding of the $100,000 deposit as a guarantee of performance of all of the covenants in the lease by the Lessee. Wheeler and Thompson flew back to Texas February 24, 1950. On February 25, the Board of Directors of Mar-Tex met, formally ratified Thompson's action, authorized the execution of the lease which was done. On March 1, Thompson received a wire from Burnett, dispatched February 28, advising that he was withdrawing all negotiations. March 6 Mar-Tex deposited $100,000 in the Bank and delivered copies of the lease previously executed to Wheeler. Wheeler returned them to Burnett
 The Mar-Tex lease provided a 40% royalty for Burnett, leaving a 60% working interest in Mar-Tex. Subsequently, August 8, 1950, Burnett leased it to Mel Dar Corporation, reserving a 25% royalty plus a $100,000 oil payment out of 37 1/2% of the gross production. By amendment October 1950 the 25% royalty was changed to 25% of net profits; the oil payment was continued but not to be charged as an expense in determining net profits. This amendment expressly took cognizance of the existence of the adverse claim (by Mar-Tex). While Mar-Tex's suit to compel delivery of this oil and gas lease was pending, Mel Dar drilled and brought in wells on the land. The trial in the state court was divided into two parts: (1) the issue of whether there had been a binding lease-- 'contract or no contract' and (2) whether Mel Dar was a good faith improver and entitled to be reimbursed for the cost of the wells drilled by it in the event Mar-Tex were ultimately held to be the lessee. In the trial on the issue (1), conducted for Burnett by other counsel, on a jury verdict a judgment was entered holding that a valid lease had been made and Burnett's effort to withdraw was ineffectual.
 At this point Burnett employed Graves to take over the case, try the reserved issue (2) of good faith improvements and, if unsuccessful in efforts to change the trial judge's decision, appeal on the issue of contract-no contract.
 Burnett's ultimate position was that the writing, being a lease, and not a contract to lease, was not binding until delivered and since he had withdrawn from all negotiations prior to the time, as stated in the letters, Wheeler was to have delivered the executed lease, there had the no delivery. Mar-Tex's initial counter-contention was that the lease and the three letters constituted a written contract binding on both; on the appeal, it changed its position to the principal claim that there was an oral agreement to lease of which the writings were a sufficient memorandum to satisfy the Texas Statutes of Frauds, art. 3995, § 4, Vernon's Ann.Rev.Civ.Stat. of Texas. It is here that the attorneys attribute much value to their skill as they claim the original appellate briefs for Burnett were artfully drafted with the strategic objective of baiting Mar-Tex into the weaker of two positions.
 The Court of Civil Appeals reversed and rendered the case in favor of Burnett and against Mar-Tex apparently on the dual ground that as a lease it was ineffective until unconditional delivery which had never been made, and the written memoranda were insufficient to satisfy the Statute of Frauds. Application for writ of error to the Supreme Court of Texas, Texas Rules of Civil Procedure 468, 469, was filed, but refused no reversible error.
 The good faith improvement phase of the case was disposed of by the entry of appropriate decree determining Mel Dar was entitled to reimbursement for $513,000 in the event Mar-Tex prevailed on the issue 'contract-no contract.' Fees due Graves and Kleberg for the good faith improvement suit were paid and are not in issue here, although, as discussed later, Burnett attempts to make much of some of the correspondence leading to their payment.
 
 
 [3]
 'Before the issuance of any writ of attachment, the plaintiff must execute a bond, with two or more good and sufficient sureties * * * in a sum not less than double the debt * * *. Such bond shall be delivered to and approved by the officer issuing the writ * * *.'
 
 
 [4]
 Art. 7.01: 'Private corporations may be created to * * *; to act as surety and guarantor * * *; * * * upon any bond or bonds that may be required to be filed in any judiciary proceedings * * *. Any such bond may be accepted and approved by the officer charged by law with the duty of accepting and approving the same without being signed by other sureties than such company. When any such bond shall exceed Fifty Thousand ($50,000.00) Dollars in penal sum, the officer charged by law with the duty of approving and accepting such bond may require that such bond be signed by two or more surety companies, or by one surety company and two or more good and sufficient personal sureties, in the discretion of the principal or official of whom the bond is required, and any statute or law to the contrary, or requiring any such bond to be signed by two or more good and sufficient sureties, shall be governed and controlled by the provisions of this article.'
 Article 7.02: 'Whenever any bond * * * is, by law * * * required * * * to be made * * * such bond * * * may be executed by a surety company, qualified as hereinbefore provided; and such execution * * * shall be in all respects a full and complete compliance with every law * * * that such bond * * * shall be executed by one surety or by one or more sureties * * * and all courts, judges * * * public officers of every character shall accept and treat such bond * * * as conforming to, and fully and completely complying with, every requirement of every such law * * *.'
 
 
 [5]
 The approval here by the State District Clerk of a single surety met the requirement of art. 7.01 providing that for bonds in excess of $50.000, the officer may require two or more surety companies, or one surety company and two or more good personal sureties. The whole statute reflects a purpose to lodge a reasoned discretion and judgment in the approving officer; the term 'may' is then permissive, not mandatory, San Angelo National Bank v. Fitzpatrick, 88 Tex. 213, 30 S.W. 1053; American Mortgage Corp. v. Samuell, 130 Tex. 107, 108 S.W.2d 193; cf. Hess & Skinner Engineering Co. v. Turney, 109 Tex. 208, 203 S.W. 593. Moreover, no actual harm, F.R.C.P. 61, 28 U.S.C.A., is or can be shown for an abuse of the District Clerk's acceptance of one surety company; e.g., see, United States Treasury Department, Form 356, Fiscal Service, Surety Bonds Branch, listing Certificates of Authority under 6 U.S.C.A. §§ 6 to 13 which, for Federal (including court) bonds, approves Aetna Casualty & Surety Co. up to $6,302,000 in 1954 and $8,674,000 in 1955
 
 
 [6]
 These included: A. W. Walker, Jr., Dallas attorney, long-time professor University of Texas, author, writer, acknowledged authority in the field of oil and gas, and a principal attorney for Mar-Tex in the case; James P. Hart, former District Judge, former Justice of the Supreme Court of Texas, Chancellor University of Texas 1950-1954; James W. McClendon, Texas Commission of Appeals 1918-1923, Chief Justice Court of Civil Appeals, Austin, 1923-1949; Everett L. Looney, then immediate past-president State Bar of Texas; Ralph W. Yarborough, former Assistant Attorney General and District Judge; Dan Moody, former Attorney General and Governor of State of Texas and long-time advocate in state and federal courts trial and appellate; and Gills Johnson, Ft. Worth, David T. Searls, Houston, active eminent practitioners in this field
 
 
 [7]
 Complaint is made of the trial court permitting Judge Graves and others to testify generally concerning the background of the case, the activities in California at the time the lease was drafted, the testimony of the witnesses in the trial, and the contentions of the parties on the ground that the record in the Mar-Tex case (it is in our record comprising 1,380 pages of testimony, 289 pages of record) was the best evidence and testimony as to what had taken place in California was patent hearsay. The point is baseless. The record was in evidence for verification by the jury, if it thought necessary; this method was undoubtedly an acceptable way to present a usable summary within some reasonable compass, Wigmore on Evidence, § 1230; McCormick and Ray, Texas Law of Evidence, § 709, page 922; Byrd v. Taylor, Tex.Civ.App., 40 S.W.2d 942 (error dismissed); Hartford Accident & Indemnity Co. v. Shaw, Tex.Civ.App., 8 S.W.2d 196 (error dismissed); New Amsterdam Casualty Co. v. W. D. Felder & Co., 5 Cir., 214 F.2d 825; and, basically, the objection misconceives the whole purpose of that evidence. This suit was not upon the original contract made in California, nor was recovery sought here on the basis of a contention or counter-contention made in the prior trial and appeal. It was relevant in order to determine just what had been done by the attorneys, whether it was difficult or simple depended upon the legal issues, problems and questions presented, the intricacy of the evidence, and the like. These contentions, counter-contentions, arguments, refutations, theories and concepts of liability and non-liability, of contract-no contract bore upon that question. These were the 'facts' relevant to the issue of attorneys' fees. They existed in addition to, and apart from, the manner in which they may have been recited, from time to time, in that record. Illustrative of this was the never ceasing argument revolving around Osborne v. Moore, 112 Tex. 361, 247 S.W. 498 of which, the vanquished advocate Walker said, the appellees got more out of the case than was actually in it. And, of course, with that record in evidence and there available for use in cross-examination, there is no demonstration of harmful error required by F.R.C.P. 61
 
 
 [8]
 The evidence which the jury could well credit showed that Judge Graves, Greenhill, his partner, Weil and Lockett of Corpus Christi and Kendall spent approximately 270 lawyer-days in the preparation of the briefs, the argument and the opposition to the Application for Writ of Error
 
 
 [9]
 Pressing hard General Counsel Memorandum 45, 1 CB 65, art. 201, International Hotel Co. v. Libbey, 7 Cir., 158 F.2d 717, appellants assert it was error for the court to charge the jury, 'That in determining the benefit, if any, derived by defendants as the result of the successful appeal * * * you will not consider income taxes, if any, imposed on defendants by reason of income, if any, from the property interest acquired or saved by defendants as the result of said appeal.' No objection of any kind was made to the charge when given or even in the motion for new trial. It is raised here for the first time. In the face of such a simple charge (one special issue on the value of appellees' services) and the skillful and lawyer-like way in which counsel for appellants carefully preserved every point, the failure to except seems to have been a calculated, intentional tactical decision weighing the advantages and disadvantages of the instruction as it was given. We decline to consider it, F.R.C.P. 51. It was certainly not a fundamental error which we should notice. Indeed, countering the assertion that it was error at all is the strong argument by appellees that if the test is the 'take home' dollars to a recipient, there would be no market stability whatever for what to a poor man might be worth a million dollars might turn out to be of little worth to one of wealth. Likewise, in calculating a market value for a sale, the transaction assumed is a capital one in which the tax impact for buyer and seller is quite different
 
 
 [10]
 The trial court adopted verbatim Burnett's definitive instructions on the factors to be considered in ascertaining reasonable value of the attorneys' services, deleting only subparagraph (h) referring to 'schedules of fees fixed by the Bar Associations in the communities where the services were rendered,' and (i) 'hourly rates paid by Burnett to the plaintiffs or any of them for comparable legal problems or litigation.' Failure to submit subparagraph (h) is not even briefed, and there is no substance to the contention made in several forms for failure to submit subparagraph (i), as well as specific issues inquiring concerning per diem charges made by appellees in other and unrelated cases for Burnett. The engagement here admittedly was for the handling of the Mar-Tex litigation and the appeal if necessary. What they were charging in other cases, what the circumstances were on which a different basis of compensation was made or agreed, what the issues and difficulaties were, were all foreign to this already complex case
 
 
 [11]
 In his letter of May 21, 1951 to Judge Graves, Burnett wrote: 'I, of course, approve your employment of the attorneys in Austin and will continue to do this in future matters handled for me when you deem it necessary
 'In other words, I like to generally rely on a leader who gets results and I think you know how to get them.'