Mel Dar Corporation v. Commissioner. Coy Burnett and Mildred K. Burnett v. Commissioner.
Mel Dar Corp. v. Commissioner
Docket Nos. 60997, 68821, 71208.
United States Tax Court
T.C. Memo 1960-56; 1960 Tax Ct. Memo LEXIS 230; 19 T.C.M. (CCH) 290; T.C.M. (RIA) 60056; 12 Oil & Gas Rep. 357; March 30, 1960
*230 The Burnetts, owners of certain real property, entered into negotiations with Mar-Tex Realization Corporation, contemplating an oil lease. They then decided against such lease, and discontinued negotiations. Mar-Tex, claiming that a lease had been executed obligating it to develop the property and entitling it to 60 per cent of oil and gas produced, commenced suit and filed a lis pendens. The Burnetts then formed Mel Dar Corporation, and executed in its favor an oil and gas lease, whereby it was to develop the property and receive 75 per cent of oil and gas produced. It thereafter intervened in the pending litigation as a party defendant. On August 1, 1951, the trial court held Mar-Tex entitled to the lease claimed subject to a duty to reimburse the defendants for expenses of developing the property. This decision was reversed on appeal in December 1952 and thus finally terminated. During the litigation, the cloud on title made it impossible for Mel Dar to sell oil produced; consequently, Coy Burnett entered into a contract in his own name for sales of oil to a major oil company, permitting the buyer to withhold 60 per cent of the sale price. In December of 1951 a bond was executed, *231 whereupon the buyer paid over all impounded funds then held by it. In December of 1952, upon termination of the suit, it paid over all remaining withheld funds. 1. Held, the funds withheld by the purchaser of the oil and gas constituted income (a) in December of 1951, as to those funds then released under bond, and (b) in December of 1952 as to the balance. 2. The original oil lease between the Burnetts and Mel Dar provided for a gross royalty of 25 per cent. Thereafter, they agreed to reduce this to a net royalty. The Burnetts controlled Mel Dar. In 1954, the parties restored the original royalty. Held: Under all the facts, the purported reduction of royalty was not the result of bona fide, arm's length dealing, and served no valid business purpose. It is a sham, and must be disregarded for tax purposes. 3. Held, Mel Dar may deduct expenses of developing the property only in the taxable year accrued or paid, and may not defer deductions to a later year pending outcome of the litigation, notwithstanding possible future reimbursement. 4. Respondent's action upheld in disallowing certain litigation expenses claimed by Mel Dar. 5. Respondent's action upheld in disallowing certain litigation *232 expenses claimed by the Burnetts. 6. In 1952 Mel Dar purchased an exclusive residential property diagonally across the street from the home of the Burnetts, and incurred substantial expenses in restoring the property to tenantable condition. The property was then rented to a daughter of the Burnetts who has continued to reside there, paying a rent substantially below the fair rental value of the premises. Neither before nor since has Mel Dar invested in residential property. Held: On the facts, the property was not purchased or held for business or investment purposes, nor for the production of income. Respondent properly disallowed any deduction in respect of expenses incurred in its maintenance. Held, further, property taxes constituting a lien on the property at the time of purchase were part of the purchase price and hence nondeductible. 7. That portion of Mel Dar's expenses attributable to nonoil operations determined. 8. Held, the pleadings fail to raise the issue as to whether Mel Dar was a "new corporation" under section 430(e) of the I.R.C. of 1939. Held, further, respondent correctly excluded a certain note from "borrowed capital" in computing Mel Dar's excess profits credit. *233 Held, further, respondent must utilize adjusted basis rather than book value in the determination of the ratio of inadmissible to total assets. 9. Held, in the computation of net operating loss carryover from 1951 to later taxable years, there must be eliminated from the loss year the percentage depletion deduction in excess of the amount of such deduction computed on the basis of cost depletion. 10. The notice of deficiency for 1951 was mailed to the Burnetts more than 3 but less than 5 years after the return for that year was filed. Applicability of the 5-year period of section 275(c) of the I.R.C. of 1939 will be determined on the basis of gross income as finally determined in the computation pursuant to Rule 50. Norman Elliott, Esq., Bill B. Betz, Esq., and Joseph T. Enright, Esq., 541 South Spring Street, Los Angeles, Calif., for the petitioners. Mark Townsend, Esq., and Michael P. McLeod, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined deficiencies as follows: Mel Dar Corporation
Fiscal Year
Ending 4/30
Type of Tax
Amount
1952
Income and Excess Profits
$62,772.68
1953
Income and Excess Profits
7,733.28
Coy Burnett and Mildred K. Burnett
Calendar
Year
1951
Income
$48,160.92
1952
Income
78,905.72
*234 The issues are principally as follows: 1. When did certain oil sale proceeds constitute taxable income? 2. Did respondent err in determining that the individual petitioners are taxable on the basis of a 25 per cent gross royalty from oil sales? 3. May the corporate petitioner defer the deduction of certain developmental expenses to a later year because of a possibility of future reimbursement existing in the year when the expenses were incurred? 4. Did respondent err in disallowing as deductions certain claimed litigation expenses of Mel Dar? 5. Did respondent err in disallowing as deductions certain claimed litigation expenses of the Burnetts? 6. Did Mel Dar hold a residential property for investment purposes or the production of income, thus entitling it to deduct certain expenses referable thereto? 7. To what extent, if any, are certain expenses non-oil expenses, so as to be eliminated in computing "gross income from the property" for purposes of the limitation on the percentage depletion deduction? 8. In computing Mel Dar's excess profits credit: (a) Do the pleadings raise the "new corporation" issue of section 430(e) of the Internal Revenue Code of 1939? (b) Is a certain "Jameson *235 note" includible as borrowed capital? (c) Did respondent err in using book values rather than adjusted basis in computing the ratio of inadmissible to total assets? 9. In computing a tentative net operating loss carry-over, did respondent err in eliminating from deductions of the loss year the excess of percentage over cost depletion? 10. Is the deficiency determined against the Burnetts for the calendar year 1951 barred by limitations? Concessions and agreements of the parties will be encompassed in the Rule 50 computation. Findings of Fact The stipulated facts are so found. Petitioners Coy Burnett and Mildred K. Burnett are husband and wife residing in Los Angeles, California. Their joint income tax returns for the calendar years 1951 and 1952 were filed on the cash basis with the then collector of internal revenue at Los Angeles. Coy Burnett will sometimes hereinafter be referred to alone as "Burnett." At all times pertinent Burnett has owned a property in Corpus Christi Bay, Texas, known as Shamrock Island. At least by early 1950 it was known to have a high oil and gas potential. In February of 1950, Burnett commenced negotiations with Mar-Tex Realization Corporation (hereinafter *236 called "Mar-Tex"), looking toward execution of a mineral lease. He finally decided that such a lease would not be to his best interests, and so informed Mar-Tex. On April 8, 1950, Mar-Tex commenced suit against the Burnetts in the District Court of Nueces County, Texas, contending that a valid lease or obligation to deliver a lease had been made. Shortly thereafter a notice of lis pendens was filed and recorded. The Mar-Tex suit was divided into two phases, the first being whether there was a valid lease or contract to deliver such lease. The second phase, contingent on victory for Mar-Tex in the first phase, involved the right of the defendants to reimbursement for amounts expended in the development of the property, and for any enhancement in its value. On August 1, 1951, the trial court entered judgment that Mar-Tex was entitled to the lease claimed, and that the defendants were entitled to reimbursement for development costs. The defendants appealed, and on June 11, 1952, the Texas Court of Civil Appeals rendered an opinion reversing the trial court. Subsequently a motion for rehearing was denied. In November of 1952 the Texas Supreme Court denied an Application for Writ of Error, *237 and a motion for rehearing was denied on December 17, 1952. Petitioner Mel Dar Corporation (hereinafter called "Mel Dar") is a Nevada corporation with principal office in Los Angeles, California. It has at all times pertinent kept its books and filed its returns in accordance with an accrual method of accounting and on the basis of a fiscal year ending April 30. Its returns in question for fiscal 1951, 1952 and 1953 were timely filed with the director (formerly collector) of internal revenue at Los Angeles. All the outstanding stock of Mel Dar is owned by the Burnetts and their three daughters. The Burnetts formed Mel Dar on May 19, 1950, as successor to Mel Dar Company, which they also controlled, the principal activity of which had been to hold title to real property and shares of stock. In addition, Coy Burnett has also been at all times pertinent president and a director of Monolith Portland Cement Company and Monolith Portland Midwest Company (hereafter called, respectively, "Cement" and "Midwest"), both engaged primarily in the manufacture and sale of cement. The oil and gas under Shamrock Island was part of a common pool or reservoir, and thus in danger of being drained off *238 in time through the wells of others. To prevent such loss, the Burnetts granted Mel Dar an oil and gas lease on Shamrock Island on June 5, 1950. Drilling and development then commenced, and continued throughout the pendency of the Mar-Tex suit. On April 30, 1951, Mel Dar intervened therein as a party defendant. The lease of June 5, 1950, read in part as follows: "4. The royalties to be paid by Lessee are: "(a) On oil, twenty-five per cent (25%) of that produced and saved from said land, * * * "(b) On gas, including casinghead gas or other gaseous substances produced from said land and sold or used off the premises, the market value at the well of twenty-five per cent (25%) of the gas so sold or used, provided that on gas sold at the wells the royalty shall be twenty-five per cent (25%) of the amount realized from said sale. It is expressly stipulated that the royalty provided for in (a) and (b) shall be delivered to the Lessors free of any and all development and production costs except taxes assessed against said royalties. "(c) On gasoline manufactured from said gas, twenty-five per cent (25%) of the market value of said manufactured product less the reasonable cost of processing *239 and transporting the same to the place of sale, * * *." A "First Amended Lease" dated July 3, 1950, was drafted, but not signed by Burnett. Among its provisions were the following: "4. The royalties to be paid by Lessee are: "(a) [No change] "(b) [No change] "(c) [No change] "(d) It is further agreed that as an additional consideration (because of Lessors' accepting herein a 25% overriding instead of 40% as specified in the disputed lease heretofore considered in certain ineffectual negotiations between one Mar-Tex Realization Corporation and Lessors herein) a conditional credit for the later payment of $100,000 shall be given by Lessee to Lessors, to be paid to Lessors only upon the following conditions: "(1) That nothing shall accrue upon this conditional obligation unless and until the net profits of Lessee created by its operation under this venture shall be adequate for, and there has been: "a. A payment and discharge of all indebtedness involved in the venture (except for current operating costs) and "b. Thereafter an adequate cash reserve created and in existence in an amount which would be adequate to permit Lessee to maintain, for a reasonable time, a ratio of current assets *240 to current liabilities of 1 1/2 times thereof." On August 8, 1950, a "Second Amended Lease" was executed, the terms of which did not vary in any material manner from those of the foregoing unsigned document of July 3. On October 16, 1950, an "Amendment" to the August 8 amendment was executed, containing the following pertinent provisions: "(a) That the Burnetts shall be in exclusive control of the development and operation of Shamrock Island, and shall proceed to make the development thereof which is provided in said Amended Lease to be the duty of Mel Dar Corporation; "(b) That, except for the conditional $100,000.00 cash royalty provided in said Amended Lease of August 8, 1950, the Burnetts shall waive any right to receive, have paid or accumulated any royalty of any kind or character until and after all costs of development and operation have been repaid, including interest and taxes thereon; "(c) That when, as and if there are net profits as hereinafter defined from the development of Shamrock Island, 25 per cent of such net profits shall become the property of and be paid to the Burnetts. That the receipt of the 25 per cent of said profits by said Burnetts, as provided herein, *241 shall be in full payment of any royalty fixed in said Amended Lease of August 8, 1950, except that the $100,000.00 cash royalty, fixed in paragraph 4 thereof, shall continue to be a valid claim and enforceable under the conditions which now apply under said Amended Lease of August 8, 1950, and no part thereof shall be regarded as an expense or cost item as against the said Burnetts' 25 per cent interest in the net profits. * * *" This agreement was acknowledged and recorded in 1954. An "ACCORD AGREEMENT" of December 29, 1954, includes the following provisions: "WHEREAS the relations of the parties hereto with reference to the oil and gas found within an 8,000feet depth in Shamrock Island have passed through the following four phases: "First: An oil and gas lease was negotiated but not delivered by Coy and Mildred K. Burnett to Mar-Tex Realization Corporation, as Lessee, covering the oil and gas involved herein, which reserved to owners 40% of all oil and gas thereafter developed and produced by Mar-Tex; and a legal action had been brought by Mar-Tex and was pending to enforce a full compliance by Coy and Mildred K. Burnett with the claimed lease; and "Second: Coy and Mildred K. Burnett *242 on the fifth day of June 1950 executed a lease with Mel Dar Corporation under which Mel Dar Corporation was to take over the development and production referred to in the claimed Mar-Tex Lease; and Coy and Mildred K. Burnett reserved, instead of the 40% specified in the Mar-Tex Lease, but 25% thereof; and "Third: It was found that the pending Mar-Tex litigation made it impossible for Mel Dar Corporation to either finance the development provided or market the oil and gas to be produced. Because the land area involved was between and nearly surrounded by producing wells, it was agreed that Coy and Mildred K. Burnett were to take immediate, exclusive charge of the development and sale of all products produced with Mel Dar Corporation cooperating to extent convenient under such new arrangement; and as it was then known that Coy and Mildred K. Burnett could thus both finance the development and market the production by use of their credit and the 40% reserved to them in the Mar-Tex Lease in event the Mar-Tex litigation ended in favor of Mar-Tex, it was provided that under certain conditions, in addition to the 25% interest theretofore reserved, a further royalty interest of $100,000 was *243 to be reserved to Coy and Mildred K. Burnett; and it was further agreed that with any substantial change of conditions either party could demand an arbitration to determine whether in equity further changes should be made in the relations between the parties; and "Fourth: During August of 1954 the buyers first made payments for oil and gas based upon a substitution of Mel Dar Corporation as seller of the oil and gas products; and the oil and gas development had proceeded to a point where Mel Dar Corporation could take over the further development and production of the oil and gas involved, "IT IS NOW THEREFORE HEREBY AGREED: "I. That effective on the 1st day of May 1954 Mel Dar Corporation shall be deemed to have taken over the management of all aspects of development and sales of products upon the lands involved herein acting for itself for 75% thereof and for Coy and Mildred K. Burnett for 25% thereof in accordance with the "Accord Lease" hereinafter set out. * * *
"III. That the execution of this agreement shall constitute a full accord and satisfaction of every account, chose in action or claim between the parties hereto with reference to any transactions concerned with the oil *244 and gas land involved herein as of May 1, 1954; and as of that date all items herein referred to shall be forever adjusted, released and satisfied, with the single exception that Coy Burnett and Mildred K. Burnett shall be obligated to still pay to Mel Dar Corporation the sum of Eighty-Four Thousand Eight Hundred Ninety-Five Dollars and Ninety-Seven Cents ($84,895.97) which is the amount which has been mutually fixed as fairly adjusting all cash differences between the parties to May 1, 1954. * * *
ACCORD LEASE * * *
"4. The royalties to be paid by Lessee are: "(a) On oil, twenty-five percent (25%) of that produced and saved from said land, * * * "(b) On gas, including casinghead gas or other gaseous substances produced from said land and sold or used off the premises, the market value at the well of twenty-five per cent (25%) of the gas so sold or used, provided that on gas sold at the wells the royalty shall be twenty-five per cent (25%) of the amount realized from said sale. It is expressly stipulated that the royalty provided for in (a) and (b) above shall be delivered to the Lessors free of any and all development and production costs except taxes assessed against said royalties." *245 A letter from Burnett to Mel Dar Corporation, dated December 30, 1954, reads in part as follows: "To make the record clear in this respect and to correctly state the account as of May 1, 1954, the Burnetts hereby advise you that we are satisfied with the inclusion of the $84,895.97 as being within the Accord Agreement and acknowledge an indebtedness in addition thereto of $58,242.12 as continuing to be valid and subsisting notwithstanding the statements and agreements contained in the Accord Agreement of December 29, 1954." On August 14, 1950, Mel Dar and the Security-First National Bank of Los Angeles (hereinafter called the "bank") entered into an agreement whereby the bank agreed to lend Mel Dar sums of money not to exceed $150,000 in the aggregate. On the same day the Burnetts agreed to subordinate in favor of the bank all existing and future claims held by them against Mel Dar. Pursuant to the foregoing agreement Mel Dar obtained a loan from the bank on August 16, 1950, in the amount of $150,000, giving its 4 per cent promissory note due January 31, 1951. Part of the proceeds of the loan was used to liquidate an existing indebtedness to the bank in the amount of $60,266.66, and *246 Mel Dar received in cash the balance in the amount of $89,733.34. At all times material, the bank maintained close business relationships with Mel Dar, Coy Burnett, Cement and Midwest, and was kept informed of all phases of the Shamrock oil operations. On September 9 and November 20, 1950, Burnett and A. J. Bankhead entered into contracts requiring the latter to drill and complete 4 wells on Shamrock Island. These wells were completed on various dates between November 1950 and March 1951. Bankhead was to receive compensation at an hourly rate payable in all events for the first well, and $125,000 per well for the next 3, payable solely out of oil and gas produced and sold. As of December 31, 1952, Bankhead had received $151,574.96 of the amount of $375,000 due in oil payments. The oil produced from Shamrock Island was sold to Atlantic Refining Company (hereinafter called "Atlantic") pursuant to an agreement with Burnett, individually. In view of the pending Mar-Tex suit, Atlantic received and exercised the right to impound 60 per cent of the value of all production, the share claimed by Mar-Tex. Atlantic also received certain easements on Shamrock Island, and further withheld 30 per *247 cent of the net proceeds of the last 3 wells for payment to Bankhead. In 1950 Atlantic held most of the leases granted by the State of Texas in the area surrounding Shamrock Island. In negotiations respecting the sale of oil, the opportunity to acquire sites on Shamrock Island for oil tank batteries and separators, and easements for pipelines, was a consideration tending to persuade Atlantic to purchase oil from Burnett. However, Atlantic refused to deal with Mel Dar, resulting in the agreement, as consummated, directly with Burnett. Atlantic was required to pay all unimpounded proceeds directly to Burnett "whether or not Mel Dar Corporation owns or claims an interest." A "division order" attached to the agreement lists Burnett as the owner of 100 per cent of oil produced on Shamrock Island. Net sales of oil from Shamrock Island and disposition of the proceeds therefrom were as follows to the end of 1952: Fiscal Year
Fiscal Year
Calendar
Ended
Calendar
Ended
Calendar
1950
4/30/51
1951
4/30/52
1952
Net Sales
$18,038.51
$122,561.70
$343,767.25
$354,012.52
$334,996.64
Disposition: Impound
10,823.11
73,535.20
206,260.34
212,409.34
182,417.86
Bankhead
22,312.98
76,221.35
79,776.10
75,353.61
Burnett
7,215.40
26,713.52
61,285.56
61,827.08
77,225.17
*248 The above amounts paid to Burnett were paid to him individually, after which he deposited the funds in a commercial bank account belonging to Mel Dar. On December 18, 1951, Burnett as principal and United States Fidelity and Guaranty Company as surety executed a bond in the amount of $250,000 in favor of Atlantic, whereupon the latter released and paid to Burnett on December 24, 1951, $199,485.05, the total amount withheld through November 1951. Burnett deposited this amount in Mel Dar's bank account. Of the total amount, $73,535.20 was attributable to sales during the fiscal year ending April 30, 1951, and the balance to the fiscal year ending April 30, 1952. Thereafter, Atlantic continued to withhold 60 per cent of the value of oil purchased by it. On December 29, 1952, following final disposition of the Mar-Tex suit in defendants' favor, Atlantic paid to Burnett, individually, $200,016.31, the total amount then still being withheld. Burnett thereupon deposited this sum in Mel Dar's bank account. No further amounts were thereafter withheld. In its income tax return for its fiscal year ending April 30, 1951, Mel Dar did not include as income any proceeds from sales of Shamrock oil. *249 For fiscal 1952 it included the amount of $302,336.81, representing all impounded funds released in fiscal 1952, plus unimpounded funds other than amounts paid to Bankhead. For fiscal 1953 it included the amount of $345,492.86, representing sales in that year, plus $86,394.74 impounded between December 1, 1951, and April 30, 1952. On December 29, 1952, Mel Dar paid $50,000 to the Burnetts, purporting to consist of $35,553.17 attributable to their right to 25 per cent of net profits and $14,446.83 attributable to the $100,000 cash royalty reserved. As of December 31, 1952, this $50,000 was the only oil payment received from Mel Dar. On December 29, 1954, the Burnetts and Mel Dar entered into an accord agreement and lease in part hereinbefore set forth, providing, inter alia, that Mel Dar would take over management of all aspects of the Shamrock property as of May 1, 1954, that the Burnetts would pay Mel Dar $84,895.97, representing an agreed-upon adjustment of cash differences between the parties to May 1, 1954, and reserving to the Burnetts a 25 per cent gross royalty. On the following day, by letter agreement, the Burnetts acknowledged an additional indebtedness to Mel Dar in the *250 amount of $58,242.12. In their joint income tax return for 1951, the Burnetts reported no income from Shamrock Island oil. For 1952 they reported $50,000 therefrom. Shamrock Island Operating Expenses During the fiscal year ended April 30, 1951, operating and drilling expenses exceeding $100,000 were incurred in the production of oil from Shamrock Island. Mel Dar did not claim any deduction for such expenses in its income tax return for fiscal 1951. In its income tax return for fiscal 1952, Mel Dar claimed as deductions all such expenses in both years, including those incurred but not deducted during fiscal 1951. Litigation Expenses Between April 21, 1950, and November 10, 1952, Mel Dar incurred or paid amounts totaling $63,187.85 in connection with or related to the Mar-Tex suit, as follows: Calendar
Fiscal
Calendar
Fiscal
Calendar
Fiscal
1950
1951
1951
1952
1952
1953
$7,915.84
$23,515.46
$51,825.40
$39,099.73
$3,446.61
$572.66
On April 30, 1952, and December 29, 1952, Mel Dar and the Burnetts divided the above expenses. The amount of $27,714.80 was allocated to Mel Dar and the amount of $35,637.54 was charged to the Burnetts. On December 29, 1952, the Burnetts paid Mel Dar $35,473.05 on account of *251 their share of the expenses. The difference of $164.49 between the amount paid and that apportioned to the Burnetts was due to an expenditure in that amount for automobile repairs erroneously charged to the Burnetts in the allocation and subsequently discovered. No part of the payments allocated to the Burnetts was deducted by Mel Dar in its income tax return for its fiscal year 1951 or by the Burnetts in their income tax returns for their calendar year 1951. For 1952, the Burnetts claimed a deduction in respect of such expenses in the amount of $34,900.39, all of which was disallowed by respondent. For fiscal 1952, Mel Dar claimed a deduction in the amount of $35,512.42 for legal and accounting expenses attributable to its oil business. Respondent allowed $8,173.65 of this amount as properly deductible for fiscal 1952, and $2,748.97 as deductible in the fiscal year 1951. The balance in the amount of $24,589.80 was disallowed. Of the expenses allocated to Mel Dar $2,047.96, paid to a law firm, was for services rendered and expenses incurred in the curing of title to Shamrock Island. The amount of $2,748.97 determined by respondent to constitute an allowable deduction for fiscal 1951 *252 was incurred in connection with the development and operation of the Shamrock oil property, and is included in the total amount allowed by respondent as such expenses for that year. During its fiscal year ending April 30, 1953, Mel Dar accrued on its books the amount of $15,000 for estimated attorney's fees. In its income tax return for that year Mel Dar deducted a total of $20,687.91 for legal and accounting expenses, which included the foregoing $15,000. Respondent disallowed the $15,000. Subsequently, in its fiscal year ending April 30, 1956, Mel Dar paid $80,000 to the attorneys who represented it and the Burnetts in the Mar-Tex litigation, after suit by the attorneys and judgment in their favor. Fremont Place Property On May 27, 1952, Mel Dar purchased at a cost of $49,620.95 a residential property located at 107 Fremont Place in Los Angeles. It has never, before or since that date, purchased any other residential property. Fremont Place is an exclusive residential area near the heart of Los Angeles. The property known as 107 Fremont Place is diagonally across the street from the residence of the Burnetts. During the fiscal year ending April 30, 1953, Mel Dar rented 107 Fremont *253 Place to a daughter and son-in-law of the Burnetts, and received from them rental income in the amount of $1,600. At the time of Mel Dar's purchase, the property was vacant and the building and grounds were in a run-down condition. A general contractor was retained and made extensive repairs and renovations, including a general cleanup. A total of $3,099.84 was expended. During its fiscal year 1953 Mel Dar paid or incurred the following expenses relating to 107 Fremont Place: Item
Amount
Interest
$1,927.00
Property tax 7/1/51-6/30/52
141.37
Property tax 7/1/52-6/30/53
$1,962.82
Depreciation - Improvements
1,235.08
Depreciation - Furniture
217.66 Under the laws of the State of California property taxes for the fiscal year July 1, 1951 to June 30, 1952, became a lien against the property on the first Monday of March 1951, and those for the fiscal year July 1, 1952 to June 30, 1953, became a lien on the first Monday of March 1952. In its income tax return for its fiscal year ending April 30, 1953, Mel Dar claimed as deductions in connection with 107 Fremont Place the following items: Item
Amount
Property taxes
$2,104.19
Repairs, maintenance, etc.
3,099.84
Depreciation of improvements
and of furniture and furnish-
ings
1,452.74
Interest
1,927.00
Total
$8,583.77
In *254 his notice of deficiency respondent allowed only the interest item, disallowing all other deductions above claimed. Percentage Depletion During its fiscal year ending April 30, 1952, Mel Dar incurred general and administrative expenses in the total amount of $26,873.13, including manager's salary and expenses of $2,808.20 and interest expense of $12,143.37. In its income and excess profits tax return for fiscal 1952, Mel Dar excluded as inapplicable to oil operations $1,445.60 of manager's salary and expense and $1,458.33 of interest expense, in computing the limit on its percentage depletion deduction. Respondent determined that all allowable expenses of Mel Dar in fiscal 1952 were allocable to oil operations. During fiscal 1953 Mel Dar incurred interest expense in the amount of $11,247.96, whereof $1,927 is allocable to 107 Fremont Place. It also incurred the following taxes and general and administrative expenses: Taxes
Production tax
$16,106.72
Property tax
Nueces County
14,243.28
Los Angeles County
2,104.19
Franchise tax
Texas
932.50
California
25.00
Employment taxes
273.00
Automobile license, Cali-
fornia
8.00
Total Taxes
$33,692.69
General and Administrative Expenses
Legal and accounting
$20,687.91
Officer's salary
4,200.00
Manager's salary
2,100.00
Travel and automobile
2,383.39
Telephone, telegraph, etc.
998.11
Total General and Ad-
ministrative Expenses
30,369.41
Total
$64,062.10
*255 In its 1953 income tax return Mel Dar, in computing the limitation on its depletion deduction, excluded the following deductions: Property tax, Los Angeles County
$2,104.19
Franchise tax, California
12.50
Employment taxes
136.50
Automobile license, California
4.00
Legal and accounting
2,843.96
Officer's salary
2,100.00
Manager's salary
1,050.00
Travel and automobile
1,358.01
Telephone, telegraph, etc.
496.55
Interest
6,188.42
Depreciation on a 1950 Packard auto-
mobile
272.90 In addition, Mel Dar excluded all items of expense attributable to 107 Fremont Place. In his notice of deficiency respondent determined that expenses relating to 107 Fremont Place were not allowable as deductions, except with respect to the interest item in the amount of $1,927, and that with the exception of that item, all expenses of Mel Dar deductible in its 1953 return were allocable to its oil operations. Jameson Note On January 17, 1934, a 5-year, nonpersonal liability, promissory note was executed in favor of J. W. Jameson Corporation by the old Mel Dar Company, in respect of a loan in the amount of $162,072.38. Collateral security consisted of 16,208 shares of stock in Cement. Various extensions of the maturity date took place, *256 the last of record to December 1, 1958. By agreement dated January 28, 1938, Coy Burnett was substituted as principal in place of Mel Dar Company. The purpose of the loan had been to enable the Burnetts to retain control of Cement and Midwest. Dissenting shareholders had questioned certain items on the books of Cement. The funds raised were used to retire those dissenting shareholders who were willing to sell, and to remove from the books certain properties. The funds in question were expended within a few years of the loan. Mel Dar never received any of such funds. On June 1, 1950, the Burnetts transferred to Mel Dar $1,000 in cash, 1,000 shares of common stock in Mel Dar Company, and 54,804 shares of common stock in Cement. They received 20,000 shares of preferred and 69,800 shares of common stock of Mel Dar. The 54,804 shares in Cement included the 16,208 shares pledged under the Jameson note, and were received by Mel Dar subject to such pledge. The note and collateral agreement were at that time in full force and effect and the note remained unpaid. The adjusted bases of the shares transferred to Mel Dar as above noted were as follows: 1,000 shares Mel Dar Company
$ 21.04
38,596 shares Cement (not pledged)
171,406.00
16,208 shares Cement (pledged)
66,858.00
On *257 June 5, 1950, Mel Dar Company was dissolved and its assets distributed to Mel Dar in exchange for the 1,000 shares of Mel Dar Company. Among the assets thus received by Mel Dar 51,920 shares of Cement with an adjusted basis to Mel Dar Company of $81,190.76. On or about June 1 and 5, 1950, Cement common stock was quoted at $5 per share on the San Francisco Stock Exchange. For financial accounting purposes the unpledged Cement shares acquired on June 1 and 5, 1950, were recorded on Mel Dar's books at $5 per share. The 16,208 pledged shares were not recorded on Mel Dar's books at any value. After June 5, 1950, Mel Dar purchased additional shares of common stock in Cement as follows: Period of
No. of
Purchase
Shares
Cost
6/5/50-4/30/51
212
$ 1,212.00
5/1/51-4/30/52
806
5,515.00
5/1/52-4/30/53
2,326
19,634.10
The obligation represented by the Jameson note was never carried as an indebtedness on Mel Dar's books. It has remained unpaid at all times pertinent. On or about June 13, 1950, prior to the aforementioned loan of $150,000, the bank acquired knowledge of the Jameson note and pledge. Net Operating Loss Carryover Respondent has computed a tentative net operating loss carryover from Mel Dar's fiscal *258 year ending April 30, 1951, to later taxable years. In so doing, he reduced the loss available for carryover purposes by the excess of the percentage depletion deduction in fiscal 1951 over cost depletion. Statute of Limitations On or before March 15, 1952, the Burnetts mailed a joint income tax return for the calendar year 1951. This return was filed in the collector's office on March 17, 1952. On March 3, 1957, the Burnetts executed a Form 872 extending to June 30, 1958, the period of assessment with respect to the calendar year 1951. The Form 872 specified that the 3-year period of limitation had expired, and that its execution is not an admission of the applicability of the special 6-year period under the 1954 Code or the 5-year period under the 1939 Code. In their 1951 return the Burnetts reported the following items of gross income: Item
Amount
Salaries
$ 75,786.36
Reimbursement for expenses
15,000.00
Capital gain
43,825.13
Dividends
1,408.55
Interest income
576.88
Total
$136,596.92 They reported adjusted gross income in the amount of $102,296.39, net income of $83,698.57 and a tax due in the amount of $36,347.47, which they paid with the filing of the return. Respondent mailed the Burnetts *259 the notice of deficiency in respect of their calendar year 1951 on September 19, 1957. Opinion Issue 1. Taxability of Withheld Funds Petitioners contend that no part of the withheld oil proceeds was taxable until termination of the Mar-Tex litigation in December of 1952, while respondent urges that, notwithstanding the withholding, all sales proceeds were taxable as sales were made. We do not agree with either principal contention. In North American Oil v. Burnet, 286 U.S. 417, a receiver was appointed in 1916 to operate certain property pending suit by the United States, which claimed title. In 1917 the lower court dismissed the action, and the taxpayer received amounts acquired in 1916 by the receiver. The United States undertook various unsuccessful appellate measures, and the litigation finally terminated in 1922. The taxpayer contended that income earned by the receiver in 1916 was taxable only in that year, or in the alternative, in 1922. The Supreme Court upheld the respondent's determination that 1917 was the proper taxable year, saying at page 423: "Second. The net profits were not taxable * * * [in] 1916. For the company was not required in 1916 to report as income an *260 amount which it might never receive. * * * There was no constructive receipt * * *, because at no time * * * was there a right * * * to demand that the receiver pay over the money. * * *" Cf. Lee McRitchie, 27 T.C. 65. In holding that taxability was not to be deferred to 1922, the Court said, at page 424: "If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income * * *, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. * * *" Commissioner v. Brooklyn Union Gas Co., 62 F. 2d 505 (C.A. 2), affirming 22 B.T.A. 507, involved two cases. In the first, which may serve as illustrative, rate reductions were challenged. In 1916 the trial court stayed the reductions, but impounded receipts in excess of the reduced rates. In 1919 the taxpayer withdrew the impounded funds upon presentation of a bond, all in accordance with an order of the court. Litigation finally ended in 1922, in the taxpayer's favor. In denying the contention of the Commissioner that the funds impounded and then released first constituted taxable income *261 in 1922 the court said, at page 506: "While [North American Oil v. Burnet, supra] casts doubt upon the correctness of the Board's theory that the excess moneys are to be allocated to the years, respectively, when the gas was sold, it strongly supports the decision that final termination of the litigation was not the critical moment. * * *
"Such money was income, being payment for service already rendered, and was received by the companies without restriction upon its use. It is true they were subject to a contingent liability to pay back an equivalent amount if the rate litigation went against them. This liability, however, imposed no restriction upon their use of the money actually in their hands. Nor did the fact that they gave bonds to get it add anything to the contingent liability they were under regardless of such bonds. * * *" Cf. Jamaica Water Supply Co., 42 B.T.A. 359, affd. 125 F. 2d 512 (C.A. 2), certiorari denied 316 U.S. 698. On a second issue, the court held that where the taxpayer was entitled to withdraw funds on presentation of a bond, such funds constituted income to it currently, as amounts which the taxpayer had the power to receive. We think the foregoing *262 dispositive of this entire issue. Respondent, seeking to rely upon the holding as to the second issue in Brooklyn Union Gas Co., asserts that petitioners had the "right" to receive all amounts withheld "simply by executing indemnity bonds," but this assertion is without foundation in the record. As we read the sales agreement with Atlantic and the various division orders, petitioners had no such right. Atlantic's right to withhold 60 per cent of all sales proceeds pending the Mar-Tex dispute was unconditional, and cannot be ignored for tax purposes. Paraphrasing the Supreme Court in North American Oil v. Burnet, supra, the petitioners were not required in the earlier tax years to report as income an amount which they might never receive. There was no constructive receipt because at no time was there a right to demand that Atlantic pay over the money. On the other hand, we agree with respondent that the funds released in December of 1951 then became taxable. Petitioners insist that such funds were released subject to a condition that they be used only in further development of Shamrock Island, or that they were "in essence" a loan by Atlantic to Mel Dar. There is, however, no basis *263 in the record for either theory. The receipt in question was unconditional, and subject only to a possible liability to repay, which existed independently of the bond. The liability to repay, but not the receipt, was contingent. Cf. Jamaica Water Supply Co., supra, at page 364. In summary, no part of the funds withheld by Atlantic was taxable until December 1951, at which time the amount then released became so taxable. The rest of the impounded monies first became taxable on their release in December of 1952. Issue 2. Net versus Gross Royalty Respondent has determined that Burnett is taxable to the extent of 25 per cent of gross oil income from Shamrock Island. Burnett contends that he is taxable only to the extent of $50,000 which he received and reported in 1952. It is apparent from the series of instruments defining the leasing arrangements, and from the amounts presently in dispute, that Burnett yielded something of substantial value when he permitted a reduction in his royalty interest from 25 per cent of gross oil proceeds to the same percentage of net proceeds. Respondent characterizes this reduction as devoid of bona fide business purposes, an arrangement having as its *264 sole aim a shifting of the incidence of taxation. Petitioners point to many purported business purposes served, but none survives close examination. It is first asserted that potential buyers, refusing to risk the outcome of the Mar-Tex case, would deal only with Burnett. We fail to follow petitioners' reasoning here. Assuming the truth of the foregoing and that Burnett acted as Mel Dar's agent, we do not understand how Burnett, as such agent, could give better or safer title to oil than could his principal. In any event, this entire theory is a non-sequitur. It no more justifies, and has no more logical relationship with, a decrease than an increase in Burnett's royalty. Indeed, in view of his greater responsibilities and duties, it would seem that any adjustment resulting from the foregoing should, seemingly, be in his favor. Petitioners next note that by October of 1950 it was apparent that Mel Dar could not function normally, and that not all funds from oil sales would be available for further development and operations. But these facts were apparent by June 5 as well, when the original lease was executed providing for a gross royalty. Litigation had already commenced and a lis *265 pendens was on file. All parties concerned were aware that title to 60 per cent of the oil was in issue, and that potential buyers were difficult to secure for litigated oil. Furthermore, the Accord Agreement of December 1954 would seem to indicate that any adjustments due to the problems previously confronting Mel Dar would tend to be in the opposite direction from that purportedly taken by the amendment of October 1950. After noting the original lease of June 5, 1950, Mel Dar's inability to finance developments or market the oil, and Burnett's ability to do these things by virtue of his credit and the 40 per cent royalty reserved in the lease claimed by Mar-Tex, the Accord Agreement describes the added $100,000 royalty as consideration to Burnett for assuming those aspects of the Shamrock operation. No further mention is made of changes in the Mel Dar-Burnett relationship, and the agreement then sets forth a gross royalty of 25 per cent, precisely that found in every document save that of October 16, 1950. Petitioners seek to minimize the significance of the foregoing by terming the Accord Agreement a "return to normalcy," following resolution of the uncertainties resulting from *266 the Mar-Tex suit. But such characterization raises more problems than it solves. The Mar-Tex issue was laid to rest in December of 1952, and all funds still withheld were then unconditionally released. No explanation is offered as to why 2 years were then required for a "return to normalcy." The Accord Agreement purports to set forth the history of the Mel Dar-Burnett relationship. If the reduction to a net royalty was a bona fide part of such history, some explanation, not present here, is required for the complete silence of the Accord Agreement with respect thereto. And as we have noted, Mel Dar's problems, whether known on June 5, 1950, or discovered thereafter, and the steps taken to counter them, would more naturally result in an increase rather than a decrease in Burnett's share of the benefits. Burnett testified at length, and he appeared to be capable, intelligent, and possessed of considerable business acumen. He is an attorney, and his experience and success in the business world is clear. A blithe assumption on his part in June 1950, notwithstanding the Mar-Tex suit, that Mel Dar could perform its functions in the usual manner, sell the oil, receive the proceeds, and freely *267 use them in its operations, would require an oblivious optimism and naivete totally inconsistent with our evaluation of this witness. We must also reject any "business purpose" argument predicated on bank indebtedness. The first bank loan was in August of 1950, when all interested parties, including the bank, were well aware of every relevant fact they could have known by the October 16, 1950 revision of the lease, short of the precise terms of the agreement with Atlantic. Knowledge that title to 60 per cent of the oil was in issue necessarily forewarned petitioners that, at least as to proceeds from the disputed share of oil, an escrow or withholding arrangement might well, indeed, probably would, be required by any prudent buyer. Nor does advance knowledge on the part of the bank aid petitioners. The sole interest of the bank was that of a creditor. It had no concern with and could not be expected to voice objections to a proposed transaction not endangering that interest, however much the transaction may have been a sham and however lacking in a bona fide business purpose. The amendment of October 16, purporting to augment Mel Dar's share of the oil, did not work against the bank's *268 best interests, and its failure to object proves nothing. Petitioners also note that as of October 16, 1950, oil had not yet been produced, and future production was still uncertain. But Shamrock Island was in the midst of a proven oil field. Burnett owned Shamrock Island, and was free to drill for oil anywhere on it; petitioners were not limited to any particular site or well. The possibility that no oil would be produced, while existent, was remote. In any event, the argument proves nothing. It still fails to demonstrate a business purpose dictating the challenged amendment. If no oil were produced, there would be no royalty of any kind. If, on the other hand, oil should be found, the reduction of Burnett's share is still unexplained in terms of any thing we might characterize as a legitimate business purpose. Finally, we note in view of some of petitioners' arguments on brief, that respondent does not seek to ignore Mel Dar as a separate entity, but merely challenges as a sham and unreal for tax purposes, one transaction between the corporation and its controlling stockholders. Specific transactions between closely related taxpayers, while not necessarily ineffective for tax purposes, *269 are always subject to close scrutiny, regardless of the validity of each taxpayer as a separate entity. Cf. Helvering v. Clifford, 309 U.S. 331, 335; Ingle Coal Corporation v. United States, 127 F. Supp. 573, 578 (Ct. Cls.), certiorari denied 350 U.S. 842; Harry C. Fisher, 29 B.T.A. 1041, 1049, affd. 74 F. 2d 1014 (C.A. 2). The bona fides of a challenged transaction is necessarily a question of fact. Petitioners have cited numerous cases on this issue, none of which can be controlling or even of substantial effect here, as the transactions there in question were sustained on the basis of facts of record absent from the instant proceeding. Thus, in Kay Kimbell, 41 B.T.A. 940, perhaps the closest on its facts to the instant case, two partners transferred oil lease interests in 1931 to their corporation, in return for an absolute cash payment, and royalties in the amount of $114,250 to each, to commece January 1, 1934. The agreement was thereafter amended, payments to begin September 16, 1936, and each partner to receive an additional $15,000 in oil. The then Board of Tax Appeals upheld the taxpayers' contention that the amended agreement controlled. Apart from the general distinction *270 that the finding of bona fides there cannot control here, we think the Kimbell case clearly distinguishable in that there was merely a delay in the time of payment, not a reduction in amount, and each partner received consideration for his forbearance, i.e., an additional $15,000. In the case before us, there is a reduction, but no offsetting benefit or adjustment in Burnett's favor. We have seen and heard the witnesses, and have reviewed the entire record herein, including all written material admitted into evidence. There is evidence supporting both sides. Viewing the entire record, however, we find the weight of all the evidence, even apart from any question respecting burden of proof, in favor of respondent's determination on this issue, and such determination must accordingly be sustained. Issue 3. Proper Year To Deduct Operating Expenses During its fiscal year 1951, Mel Dar incurred and paid various amounts in respect of intangible drilling costs and operating expenses in devoloping the oil potential on Shamrock Island. It deducted such expenses in its fiscal year 1952. Respondent disallowed this deduction, on the ground that the expenses were deductible solely in fiscal 1951. *271 Petitioners now claim that the expenses were deductible in fiscal 1953, when the Mar-Tex litigation ended. Much of petitioners' argument on this issue seems to stem from the theory, which we believe erroneous, that in fiscal 1951 Mel Dar had a "settled right" to reimbursement of such expenses from Mar-Tex. Any such "right" was necessarily contingent upon final outcome of the Max-Tex litigation, and required, specifically, a victory therein for Mar-Tex. Neither the jury verdict of November 1950 nor any other event taking place prior to December of 1952 constituted a final termination of the suit, or created a "settled right" to reimbursement. Only on December 17, 1952, were the contingencies surrounding this and other matters resolved, and then in such manner as to negative forever any right of Mel Dar to be reimbursed for the expenses here in controversy. In a sense, this case is another aspect of the "claim-of-right" doctrine, that income received by one claiming to be entitled to it is taxable, notwithstanding a possibility that repayment may subsequently be required. North American Oil v. Burnet, supra. Here Mel Dar, denying the claims of Mar-Tex and asserting the validity and *272 exclusiveness of its own lease, incurred and paid in fiscal 1951 expenses on its own behalf in developing what it asserted to be its own interest in an oil property. Clearly, absent the Mar-Tex suit, only in fiscal 1951 would such expenses be deductible. We are unable to agree that such deduction must be deferred to a later year because a present, enforceable right to reimbursement might subsequently arise. Cf. Alleghany Corporation, 28 T.C. 298. At any given time, Mel Dar's right to reimbursement could only be as fixed or "settled" as the obligation of Mar-Tex to make reimbursement. Thus, this right was sufficiently fixed in fiscal 1951 to prevent deductibility of the expenses in controversy only if the liability of Mar-Tex to reimburse Mel Dar was so fixed that Mar-Tex could have then accrued and deducted that liability. Since at the close of fiscal 1951 litigation was still pending, the ultimate outcome of which would determine the existence or nonexistence of that duty, it seems clear that such accrual would have been improper. Cf. Security Mills Co. v. Commissioner, 321 U.S. 281; Dixie Pine Co. v. Commissioner, 320 U.S. 516; Consolidated Edison Co. of New York v. United States, 135 F. Supp. 881 *273 (Ct. Cl.), certiorari denied 351 U.S. 909. In United States v. Texas Mexican Railway Company, 263 F. 2d 31 (C.A. 5), in reversing the district court and holding nonaccruable a deposit in escrow pending appeal from a tort judgment against the taxpayer, the Court of Appeals said, at page 32: "We reverse, on the ground that the deduction may be accrued only in the year in which the taxpayer's liability became fixed and certain. That was the year in which the judgment became final." And on page 34 the court went on to say: "The rationale of Dixie Pine and Security Mills is clear. A taxpayer seriously contesting a claim may not accrue it until liability is determined with reasonable certainty. * * * the existence of any liability is uncertain until the last bell is rung in the last court." Under the rather peculiar facts here, the contentions of Mar-Tex were such that, if sustained, a liability to reimburse Mel Dar would almost certainly arise, while those of Mel Dar were inconsistent with any right on its part to be reimbursed. Nonetheless, both the right and duty were uncertain and contingent. Mar-Tex could not under any theory have properly deducted any amount in fiscal 1951 in respect *274 of a liability to reimburse Mel Dar, and the latter, for the same reasons, may not defer to a later year the deduction for expenses then incurred and paid. Cases cited by petitioners are not in point. Cf. Levy v. Commissioner, 212 F. 2d 552 (C.A. 5); Universal Oil Products Co. v. Campbell, 181 F. 2d 451 (C.A. 7), certiorari denied 340 U.S. 850; Glendinning, McLeish & Co. v. Commissioner, 61 F. 2d 950 (C.A. 2), affirming 24 B.T.A. 518; Island Petroleum Co. v. Commissioner, 57 F. 2d 992 (C.A. 4), affirming 17 B.T.A. 1, certiorari denied 287 U.S. 646; Smith v. United States, 135 F. Supp. 694 (D.N.H.); Estate of Elmer B. Boyd, 28 T.C. 564; Richard M. Drachman, 23 T.C. 558; Standard Oil Co. of New Jersey, 7 T.C. 1310. In none of the foregoing was the right to reimbursement inchoate or contingent. In Levy, Universal and Glendinning, the taxpayers simply failed, for whatever reasons, to exercise unquestioned, presently enforceable rights to be reimbursed. In Island Petroleum Co. and Drachman the payments constituted loans, and debtor-creditor relationships were held to have been intended. In Smith and Boyd the payments were portions of, respectively, taxes and necessary repairs *275 allocable to the interests of acknowledged co-owners. In addition, the payment in Smith was in the nature of a capital expenditure, in the course of acquisition of the other co-owner's interest. And finally, in Standard Oil, the taxpayer had paid another's debt as a surety or guarantor. Under suretyship law its right to reimbursement was subject to no contingency and was never denied. In the instant case, the rights of all parties concerned, and hence the right of Mel Dar to reimbursement from Mar-Tex, were wholly contingent until final termination of the litigation in December 1952. A present, enforceable right to reimbursement never arose. The jury verdict of November 1950 could not create it; nor was it created by the entry of judgment on August 1, 1951, (in Mel Dar's fiscal year 1952) as that judgment was appealed. During fiscal 1951 Mel Dar's right to reimbursement, but not the expense itself, was contingent. The latter, but not the former, was subject to accrual. Cf. Jamaica Water Supply Co., supra, at page 364. Finally, petitioners urge that the result sought by respondent would create a distorted picture of Mel Dar's income. But as was noted in Commissioner v. Brooklyn Union Gas Co., supra, *276 application of the doctrine set forth in the North American Oil case may at times do just that. Indeed, Congress has recognized that such distortions may at times result from normal operation of the usual rules for reporting income and deductions, and has enacted various remedial provisions. If no such provision applies here, or if relief obtainable seems inadequate, we are not thereby empowered to create new measures of relief or to disregard settled rules as to the taxable period within which items of income or expense are to be reported. The expenses here in question were deductible solely in Mel Dar's fiscal year ending April 30, 1951, and respondent's determination to that effect must be sustained. Issue 4. Litigation Expenses of Mel Dar 1. In its return for the fiscal year ending April 30, 1952, Mel Dar deducted the amount of $35,512.42 as legal and accounting expenses. [1] Of this amount $24,589.80 was claimed as expenses in connection with the Mar-Tex litigation. Of the $35,512.42 total deducted, respondent allowed $8,173.65, held that the amount of $2,748.97 was properly deductible only in the previous year, and disallowed the remaining $24,589.80, the statement attached to *277 the notice of deficiency explaining the latter action as follows: "It is determined that the costs assumed by Mel Dar Corporation with respect to litigation brought by Mar-Tex Realization Corporation against Coy Burnett, do not constitute ordinary and necessary business expenses of the corporation in view of the nature of the action, which would have deprived Mel Dar Corporation of its valuable leasehold on Shamrock Island, and in view of the terms of the lease, as amended, wherein Mr. Burnett virtually guaranteed peaceful possession of the property. To the extent, if any, that these costs were bona fide obligations of Mel Dar Corporation they represent capital expenditures, recoverable through depletion deductions. Amount disallowed $24,589.80". It would appear from the foregoing and from respondent's arguments on brief that the above disallowance is based on two grounds: (1) It was an expense of Burnett, not of Mel Dar. (2) It was a capital expenditure. Respondent's first point need not be decided since his second point is meritorious. The Mar-Tex suit was manifestly *278 primarily a title contest, the subject matter being the 60 per cent leasehold interest claimed by Mar-Tex. Mel Dar's leasehold interest was defective from the start. The Mar-Tex claim, in existence and known to Mel Dar prior to the first Burnett-Mel Dar lease, constituted at all times until December 17, 1952, a cloud on Mel Dar's title. The expenses of removing that cloud seem clearly capital in nature. The instant proceeding is thus entirely distinguishable from and, indeed, unrelated to Walter S. Heller, 2 T.C. 371, affd. 147 F. 2d 376 (C.A. 9), certiorari denied 325 U.S. 868, relied upon by petitioners, where a dissenting shareholder in a corporate merger instituted litigation pursuant to State law solely to require a valuation and purchase by the corporation of shares of stock concededly owned by him. In Safety Tube Corp., 8 T.C. 757, affd. 168 F. 2d 787 (C.A. 6), the taxpayer was formed to take over patents held by persons then defending an infringement suit, agreeing to intervene as a party defendant, which it did. The complaint prayed, inter alia, that the plaintiff be declared owner of the patent and all funds paid to defendants by the licensee. We held taxpayer's litigation *279 expenses nondeductible, saying at page 763: "In attempting to bring its payments within the scope of the Kornhauser case and other cases which have followed it, petitioner is at pains to stress that it was defending a claim against the income produced by its business and that Seaton's claim of title to the patent was removed in 1939 by decision of the Tennessee Supreme Court sustaining the demurrer as to the ownership of the Bradley patent. As the fees covered legal services rendered in connection with the demurrer, as well as other services, we can not agree that defense of title to the patent was not involved. But, quite apart from this item of the complaint, we are of opinion that the suit involved primarily rights of a capital character and that the accounting for royalties, demanded in the complaint, was only a corollary of the determination of those rights, applicable not only to 1940, but equally to prior and subsequent years. Seaton claimed for himself and associates a participating interest in petitioner's commercial use of the patent. This claim and the expenses incurred in resisting it bore no special relation to 1940 or any other year. Seaton demanded part or all of the *280 earnings of the business for all years, a right in or to the incomeproducing asset that petitioner resisted, not a claim against specific income therefrom." And in its affirming opinion, the Court of Appeals said, at pages 789-790: "Petitioner contends that these decisions are not applicable where the issue of title is incidental to a controversy in which the main relief sought is a judgment for amounts representing income. It contends that when it amended the prayer of its petition in the Tennessee court on November 29, 1939, all questions of title to the patent were removed from the case and the gist of the action became the right to the income which had been earned from the manufacture of the patented device. We think this contention clearly has no merit. The amendment involved no abandonment of the original prayer for a decree in favor of Seaton, holding him to be the rightful owner of the Bradley patent. The amendment was in the alternative and only limited the prayer to a request for a decree that all persons who had purchased assignments of interest from Seaton, and Seaton himself, were entitled to a percentage of the funds realized from marketing the Bradley patent in case *281 the court should rule against Seaton with reference to the question of title. The suit clearly involved the title to the Bradley patent as a principal issue and the accounting for royalties as held by the Tax Court was only a corollary to the determination of rights under the patent. The gist of the controversy is the right to the asset which produced the income. If the Bradley patent belonged to Seaton, then obviously the petitioner was not entitled to royalties. Unlike the case of Kornhauser v. United States, 276 U.S. 145, 48 S. Ct. 219, 72 L. Ed. 505, and Rassenfoss v. Commissioner, 7 Cir., 158 F. 2d 764, relied on by petitioner, the litigation here struck at the very ownership of the patent itself. Moreover, the fact that the Supreme Court of Tennessee held that the petition was demurrable with reference to the question of title does not affect the taxability of the item for attorneys' fees. Although that court held that a cause of action was not stated upon this phase of the case, the title to the patent was attacked in the suit and the expenses of litigation were paid out in defense of the title. The Tax Court's conclusion that the expenditures for litigation were not deductible *282 was clearly correct." Cf. Moynier v. Welch, 97 F. 2d 471 (C.A. 9); Murphy Oil Co., 15 B.T.A. 1195, affd. on this issue 55 F. 2d 17 (C.A. 9), affd. on other issues 287 U.S. 299. We conclude from the record as a whole in so far as it bears upon this issue, that the Mar-Tex litigation was primarily a title suit, and that the issues of reimbursement for expenses and compensation for enhancement were only corollary and subsidiary thereto. To be sure, the jury verdict of November 1950 forced Mel Dar to actively pursue the accounting, i.e., reimbursables phase of the proceeding. Nonetheless, the primary issue was still that of title and the proceeding to determine the reimbursables a mere incident thereof. This issue (title) was still very much in the case, and was in fact eventually so resolved as to make moot all matters pertaining to reimbursement and enhancement. The last factor above mentioned makes this case readily distinguishable from E. J. Murray, 21 T.C. 1049, affd. on other grounds 232 F. 2d 742 (C.A. 9), certiorari denied 352 U.S. 872, where the accounting proceeding took place after the Supreme Court of Oregon, in reversing in the taxpayer's favor the trial court's decision *283 on the title issue, had finally and completely eliminated that issue. In view of the foregoing we must hold Mel Dar's expenses resulting from the Mar-Tex suit nondeductible capital expenditures. Respondent did not err here. 2. In its fiscal year ending April 30, 1953, Mel Dar deducted $15,000 as accrued legal expense resulting from the Mar-Tex case. Respondent disallowed the deduction so claimed. The paucity of evidence as to this item would alone require a denial of the deduction sought, since petitioners have not supplied facts of record sufficient to prove the amount here in controversy properly accruable in fiscal 1953. We need not rely upon the burden of proof, however, for we must deny any deduction of this expense, whether or not accruable, for the same reason we denied the deduction sought for 1952, namely, that the lawsuit in which it was incurred was primarily one respecting title. If anything, it is even clearer that this item must be so characterized. The obligee was the law firm which handled the appeal in the Mar-Tex case, resulting in a reversal of the trial court decision as to validity of the Mar-Tex lease, and thus making moot all other questions, including those *284 of reimbursement and enhancement. Finally, to the extent any light has been shed, the record affirmatively shows that as late as 1956 Mel Dar took the position that no services had been rendered to it by the law firm involved and that it was therefore liable for no fee. The law firm had sued Mel Dar and Burnett, eventually recovering $80,000. Burnett v. Graves, 230 F. 2d 49 (C.A. 5), certiorari denied 351 U.S. 984. In the course of its opinion (a copy of which was introduced into evidence by petitioners) the court said, at page 53: "Mel Dar Corporation likewise insists that there were no services rendered for it, and consequently it should be exonerated without further inquiry. We do not agree. Mel Dar was a party in the appeal proceedings, and its interests were placed in Appellees' hands for full protection. It had a great deal at stake. If Mar-Tex won, all Mel Dar had was a recovery of $513,000 as good faith development costs, and the working interests which it had under the lease from Burnett would be lost altogether. That Burnett's name was nearly always singled out in the briefs, or the emphasis was on him as the moving figure detracts none from Mel Dar's substantial financial *285 interests successfully preserved by the appeal. Moreover, in the long negotiations over the disputed fees, it was Mel Dar's check for $15,000 which was twice tendered to appellees. All of this evidence was ample to permit the jury finding that services of value to Mel Dar were rendered imposing on it the obligation to pay a reasonable fee. * * *" The deduction here in question must be denied. Issue 5. Litigation Expenses of Burnett During the years 1950, 1951, and 1952, Mel Dar incurred or paid 99 items of expense totaling $63,187.85, which it listed in an account designated "Mel Dar Corporation Ledger, Coy Burnett Suit Expense," hereinafter called the "Suit Account." On April 30, 1952, and December 29, 1952, the respective amounts of $35,064.88 and $572.66 were charged to Burnett. On December 29, 1952, Burnett paid Mel Dar $35,473.05 in respect of the foregoing charges. The difference, in the amount of $164.49, between total charges to Burnett and the amount paid by him is attributable to an automobile expense erroneously allocated to Burnett. In their 1952 income tax return, the Burnetts deducted $34,900.39 in respect of the above payment. Respondent disallowed this deduction in *286 its entirety. Paragraph 241 of the stipulation of facts lists the 99 items in the Suit Account. A folder introduced into evidence as petitioner's Exhibit 47 contains bills, vouchers and other papers relating to some but not all of the Suit Account items. In their opening brief petitioners divided the expenses allocated to Burnett into the following categories: 1. Hotel and travel expenses for
Shamrock operations
$11,162.20
2. Fees for legal analysis of justifi-
cation of risk expenditures in
developing Shamrock Island in
face of Mar-Tex issue
11,103.85
3. Legal fees - First phase of Mar-
Tex suit
3,007.37
4. Legal fees - Second phase of Mar-
Tex suit
9,131.67
5. Legal fees and expenses - Nevada
suit
659.79
Total
$35,064.88 [2] *287 In the reply brief a different allocation appears, as follows: 1. Oil operations
$ 6,162.04
2. Mar-Tex suit (Phase 1)
4,420.64
3. Mar-Tex suit (Phase 2)
21,168.62
4. Nevada suit
927.74
5. Mar-Tex appeal
572.66
6. Title by limitation
27.50
7. Research re risk of developing
Shamrock
2,358.34
Total
$35,637.54 We assume that the reply brief, constituting petitioners' last word on this matter, represents their present position, and will examine each category above set forth in accordance therewith: Oil operations - Petitioners now contend that $6,162.04 of the amount allocated to Burnett as his share of the Suit Expense account in reality represented expenses of Shamrock Island oil operations. On June 5, 1950, the original Burnett-Mel Dar lease was executed, under which all oil operations on Shamrock Island became Mel Dar's responsibility, to be undertaken at its expense. To be sure, Burnett personally took over such operations, but, as petitioners themselves take great pains to point out elsewhere, only as Mel Dar's agent. Thus, all expenses incurred after June 5, 1950, in developing Shamrock Island were those of Mel Dar. No part of such expenses was properly allocable to Burnett, and, to the extent *288 actually paid by him, was reimbursable by Mel Dar. Petitioners object to respondent's characterization of Burnett as a "mere" agent in carrying on oil operations, but do not and cannot deny that he did act as Mel Dar's agent. They contend that it was doubtful whether Mel Dar would be required to reimburse Burnett. But Mel Dar had already paid these expenses, and petitioners do not show how Burnett was under an obligation to reimburse it, as he did on December 29, 1952. Accepting petitioners' premise that Burnett acted as Mel Dar's agent, we think the matter completely free of doubt, even as to reimbursement by Mel Dar of expenses paid by Burnett. To be sure, had Mar-Tex prevailed, it and not Mel Dar would have borne the ultimate burden of the expenses, but in the first instance, as between Mel Dar and Burnett, the former's sole obligation for ordinary and necessary expenses incurred in carrying on its own business matters seems unquestionable. In any event, to the extent the claims of Mar-Tex created any such uncertainty, this went only to the question as to which corporation would have to bear the expenses, or, at best, reimburse Burnett. His lack of liability for operational expenses *289 and right to be reimbursed for any paid by him seem clear. The only expenses of oil operations properly deductible by Burnett are those incurred prior to the Mel Dar lease of June 5, 1950. Only three of those items making up the $6,162.04 claimed fall within that period, and the record falls far short of establishing them to be ordinary and necessary expenses of oil operations. For example, item 4 of Exhibit 47, the first item listed as an operational expense, and incurred in April of 1950, is in the amount of $402.96, made up of the following: Plane Fare - Los Angeles to Dallas
$329.14
Excess Baggage - Dallas to Los Angeles
5.87
Excess Baggage - On flight to Dallas
1.24
Plane Fare to Corpus Christi
66.71
Total
$402.96
The fare from Los Angeles to Dallas is expressly noted as for "Mr. and Mrs. C. Burnett," and it is at least inferable that the other services were of a similar nature. No business purpose is apparent from the record requiring travel by Burnett's wife or her physical presence in Texas, and as to any portion allocable to her there is clearly a failure of proof. Moreover, the mere fact that Burnett was in Texas at a particular time is not in itself proof of his purpose in being there. *290 This particular trip may have been personal. The presence of Burnett's wife at least permits such an inference. Or it may have been referable solely to the Mar-Tex suit, which had apparently been commenced several days previously. We simply do not know, and cannot assume an answer favorable to petitioners. Only two other items of Exhibit 47, items 5 and 6, appear to represent expenses incurred prior to execution of the Mel Dar lease. Item 5 consists of Dun § Bradstreet charges totaling $12.60 but with no indication as to the subjects of the reports or the purposes for which they were made. Item 6 is a list of telegraph and telephone charges totaling $905.97 which petitioners assert relate to oil operations and a certain Nevada litigation in the respective amounts of $255.80 and $650.17. Unfortunately for petitioners, the evidence of record does not suffice to identify the items in question. We may not speculate as to the actual purpose of each credit report or telephone call and cannot, in the face of a silent record, make findings in petitioners' favor. In summary, petitioners have failed to establish that any amount is deductible by Burnett in respect of oil operations. Mar-Tex *291 suit - Petitioners attribute a total of $26,161.92 to the Mar-Tex suit, as follows: First phase
$ 4,420.64
Second phase
21,168.62
Appeal
572.66
Total
$26,161.92
As has already been noted, apart from any question of sufficiency of proof of amounts allocated between different aspects of the suit, the entire litigation primarily concerned title, other questions, such as reimbursement and/or enhancement, being corollary to that of ownership of the leasehold interest in controversy. All expenses of such suit are nondeductible capital expenditures, regardless of "phase." Nevada declaratory suit - This litigation was an attempt to "head off" the Mar-Tex suit in what, if successful, would probably have proven a far quicker and less costly proceeding. The principal, in fact the only, purpose for the commencement and prosecution of this action was to vindicate Burnett's contention that Mar-Tex had no leasehold interest. The question involved, while on the face of it the construction of certain documents, was in fact the determination of title, as between two claimants. The amount allocated thereto by petitioners ($927.74), assumig arguendo the correctness of such allocation, is a nondeductible capital *292 expenditure. Title by limitation - This category of expenses, amounting to only $27.50, is nowhere further explained, although its very characterization would seem to indicate it to be capital in nature, and we so hold. Researching risks of further Shamrock development - As a result of the claims of Mar-Tex, questions arose as to the feasibility of developing Shamrock Island in the face of those claims, and legal expenses were incurred therein. In their opening brief petitioners claimed $11,103.85 as the amount of such expenses, but in their reply brief they have reduced this category to the amount of $2,358.34. Only two specific items of expense are encompassed herein. The first is simply listed in the stipulation of facts as a payment in the amount of $25 on August 8, 1950, to Donald J. Dunne for "Attorney's Fees re Research." We are not enlightened as to the actual date these services were contracted for or rendered, their actual nature, or for whose benefit (Burnett's or Mel Dar's). A fleeting reference thereto in Burnett's testimony is no more helpful. The other portion of this class of expenses consists of $2,333.34 of total legal expenses in the amount of $7,500 paid on September *293 17, 1951, to a Los Angeles law firm. The payee firm worked on both phases of the Mar-Tex suit. Item 80 of Exhibit 47, pertaining to this expense, consists of bills for legal services. The first, in the amount of $3,500, covers services rendered through December 31, 1950, and the second, in the amount of $4,000, covers services rendered from January 1, 1951, to March 31, 1951. Burnett testified that approximately two-thirds of the earlier voucher resulted from services rendered in reviewing the hazards of developing Shamrock Island in the face of claims by Mar-Tex. Burnett is an attorney, and was familiar with all aspects of the various legal problems then existing. We can find no reason to doubt the accuracy of this allocation. However, we are dealing now with a deduction claimed by Burnett. He may not deduct expenses properly those of Mel Dar, even if he chose to pay them. There is no evidence that any portion of this expense was in fact his rather than Mel Dar's. In summary, we cannot find error in respondent's treatment of this issue. Issue 6. Fremont Place Property The property at 107 Fremont Place is located in an exclusive residential neighborhood, diagonally across the street *294 from the Burnetts' residence. Mel Dar purchased this property for approximately $50,000, and expended an additional $3,099.84 in repairs and renovation. The property was rented to a daughter of the Burnetts for an amount which could not and did not produce net income, and which we find from the entire record to have been inadequate. Never before or since this purchase has Mel Dar invested in residential real estate. We agree with respondent that the above facts "speak louder than the self-serving testimony of Burnett to the effect that the property was purchased as an investment." We find as facts from the entire record that the purpose of Mel Dar's purchase and maintenance of this property was to provide a home for the Burnetts' daughter at a bargain rental, not to produce income or to hold as an investment for future sale. Petitioners seek to minimize the "bargain" feature of the rental by noting that the $1,600 received covered not a full year, but rather 10 months, at a rental of $160 per month. But on a full 12 months' basis the tenant would pay rent in the amount of only $1,920. Meanwhile, annual real estate taxes for the fiscal year ending June 30, 1953, were in the amount of *295 $1,962.82, and interest was incurred for Mel Dar's fiscal year ending April 30, 1953, in the amount of $1,927. Thus, ignoring depreciation for the moment, fixed out-of-pocket annual expenses were at least double the rent being received. And it would even appear, from the fact that the depreciation claimed in the amount of $1,452.74 included $217.66 as depreciation on furniture, that the house was rented at least partially furnished. We are also wholly unimpressed by testimony to the effect that the premises are now salable at a price far in excess of the purchase price paid by Mel Dar. If this fact were evidence that the property had been purchased and held for investment purposes, rare indeed would be the homeowner who purchased a home several years ago and who could not make the same claim. The foregoing precludes any deduction in respect of depreciation or of repairs and renovation, and also makes it unnecessary to consider at this time whether, as claimed by respondent, the latter items constituted capital expenditures. Further consideration is necessary only in respect of property taxes for fiscal years ending, respectively, June 30, 1952, and June 30, 1953, since the deductibility *296 of such taxes does not require that the property be held for any particular purpose. The parties have stipulated that these property taxes became liens on the first Monday of March in 1951 and 1952, respectively. Mel Dar purchased the property on May 27, 1952. The law is too well settled to require any extended discussion, that taxes constituting a lien on property at the time of its acquisition are not deductible by the purchaser, although paid by him, but constitute a part of the purchase price paid. Cf. Magruder v. Supplee, 316 U.S. 394; Milton L. Grahm, 26 T.C. 315. Respondent's determination with respect to this issue is sustained. Issue 7. Nonoil Expenses In its returns for the fiscal years 1952 and 1953, Mel Dar treated certain expenses as attributable to nonoil operations and hence nondeductible in the computation of its net income from the property for purposes of the limitation on its percentage depletion deduction. Respondent determined in the notice of deficiency that all of Mel Dar's expenses other than those attributable to 107 Fremont Place are allocable to oil operations. During the years in question, Mel Dar held substantial investments apart from its oil properties *297 and activities, and its ownership of and activity with respect to 107 Fremont Place. However, it is apparent that its investment activity was largely that of a passive investor and holding company. Accordingly, while some portion of its management expense is allocable thereto, we cannot accept without qualification the rather general testimony of its then manager to the effect that 50 per cent of his time was spent on nonoil activities. Considering the entire record, our best estimate of management expense is that 30 per cent thereof may be so allocated to nonoil activities. There is no evidence in the record that any interest expense in addition to the amount of $1,927 in fiscal 1953 respecting 107 Fremont Place is allocable to nonoil operations. While Mel Dar purchased stock during the years in controversy, the record is barren of evidence as to the source of funds so utilized. Petitioners seek to supply such proof by a pyramiding of inferences, suppositions and speculations. Thus, at page 178 of their reply brief they state: "Money to make these purchases and to conduct these other activities had to come from somewhere. It came from the loan funds. Mel Dar had almost no cash in *298 the beginning [Ex. 43-QQ, pars. 186, 187, 193]. It had to acquire cash through loans from the bank [Ex. 43-QQ, pars. 41, 52]. The first loan was acquired on the strength of Mel Dar's stock holdings [T. 41]. In other words, cash acquired on the strength of Mel Dar's 'other' activities put Mel Dar in the oil business. Later, during the taxable years ended April 30, 1952. and April 30, 1953, when the oil operations were in full swing and the impounds released, Mel Dar had cash receipts from the oil operations. It is only logical to assume that the oil money would be used in the oil operations, if at all, and that the money used in other ventures consumed loan funds first. That is, oil receipts earmarked for oil operations and loan funds earmarked for other activities. Under the circumstances, that is the only proper way to consider it. The other activities were the basis of the original loan and should now have access to the funds relating thereto." Unfortunately for petitioners, there is no proof whatever that matters were in fact conducted as they now insist should have been done. Mel Dar received substantial funds from oil operations and we are not free to assume without proof that *299 all or part of the amounts used in its nonoil activities was financed with loan proceeds rather than receipts from sales of oil. In its fiscal year 1953 Mel Dar sought to treat as nonoil expenses certain expenses in addition to management salary and interest. We agree, although with no strong conviction, that officer's salary, travel and automobile expenses, telephone and telegraph expenses, payroll taxes and California automobile license expense are allocable in the same proportions as is managerial salary. Accordingly, 30 per cent of such expenses is attributable to nonoil operations. Petitioners also seek to treat as nonoil expenses $2,843.96 of a total of $20,687.91 in legal and accounting expenses, all automobile depreciation, and one-half of the California franchise tax. While purchases of Cement stock and the purchase of and activity relating to the Fremont Place property undoubtedly resulted in some legal and accounting expenses, they do not appear to justify the entire amounts attributed thereto by petitioners. In view of the paucity of evidence, but convinced that some amount is allocable thereto, we find as a fact that for fiscal 1953 legal and accounting fees in the amount *300 of $1,000 are attributable to nonoil activity. We perceive no reason to prorate automobile depreciation or franchise taxes differently from automobile license fees or managerial salary, and accordingly find as a fact that 30 per cent of such items is attributable to nonoil operations. Issue 8. Excess Profits Credit 1. New Corporation Petitioners contend that in the computation of Mel Dar's excess profits tax liability respondent erred in failing to treat Mel Dar as a "new corporation" pursuant to section 430(e) of the Internal Revenue Code of 1939. Respondent argues initially that this issue is not properly before the Court, and we agree. Earl V. Perry, 22 T.C. 968, 975. In so far as it relates to excess profits taxes, Mel Dar's petition reads as follows: "(2) On page 5 of the statement regarding the Commissioner's computation of excess profits credits, he erred when: "(a) He did not allow the corporate obligation to J. W. Jameson Company as borrowed capital in the sum of $162,072.38, which sum was a corporate obligation. "(b) He based his computation of accumulated earnings and profits upon the changes and readjustments he made as to income and expenses heretofore alleged to be *301 erroneous. "(3) On page 9 of his statement he computed the unused excess profits credits carry-over from taxable year ending April 30, 1951 to taxable year ending April 30, 1952, he again erred when: "(a) He did not allow the corporate obligation to J. W. Jameson Company as borrowed capital in the sum of $162,072.38, which sum was a corporate obligation. "(b) He based his computation of accumulated earnings and profits upon the changes and readjustments he made as to income and expenses heretofore alleged to be erroneous. "(c) He determined the amount of carry-over and/or carry-back was based upon his adjustments to the net income which determination of net income has been alleged to be in error. * * *
"(7) On page 19 of the statement in relation to his computations of excess profits credits for the taxable year ended April 30, 1953, and his statemtnt of accumulated earnings and profits for the taxable year April 30, 1952 in the sum of $25,792.56, which sum is used in his computation of excess profits credits, is erroneous as stated in subpargraphs (8) and (9) of paragraph B hereof." Petitioners, in seeking to justify our consideration of this issue, point to the following language *302 in Mel Dar's petition: "(4) The computation of the income tax payable for the fiscal year ending April 30, 1952 and the Commissioner's finding a deficiency in said income tax in the sum of $62,772.68 is erroneous because the Commissioner's deficiency was based upon his erroneous computations of taxable income as heretofore set out. * * *
"(8) On page 20 of the statement the determination that there is a deficiency in income tax in the sum of $7,733.28 is erroneous because it is based upon erroneous computations of taxable income for the taxable year ending April 30, 1953 as stated. * * *
"(13) The Commissioner erred in each and every computation because of the readjustments and reallocations he made as reflected in his statement accompanying his notice of deficiency of November 14, 1955 (Exhibit A), and in each and every particular thereof." We do not believe that petitioners can be sincere in contending that the foregoing material pleads the "new corporation" issue. It does not, and we resolve such issue in favor of respondent. 2. Jameson Note. Mel Dar contends that in computing its excess profits credit the obligation to the J. W. Jameson Corporation in the amount of $162,072.38 must *303 be included in borrowed capital, pursuant to section 439 of the Internal Revenue Code of 1939. [3]
It is first *304 urged that the two sentences of section 439(b)(1) create separate and unrelated tests or definitions of borrowed capital. Under this theory, Mel Dar asserts that the Jameson note qualifies under the terms of the second sentence, regardless of the presence or absence of the good faith business purpose cited in the first sentence. We think such a construction untenable. The first sentence of section 439(b)(1), which Mel Dar seeks to avoid, expressly mentions, inter alia, a mortgage. The second sentence, referring to property "subject to a mortgage or other lien," must necessarily be read in pari materii therewith. Moreover, it would be absurd to ascribe to Congress an intent to permit a secured indebtedness to qualify ipso facto, while, at the same time setting forth a test of good faith business purposes for all other debts. Regulations 130, section 40.439-1(d), provide: "In order for any indebtedness to be included in borrowed capital it must be incurred in good faith for the purposes of the business and not merely to increase the excess profits credit." [Italics supplied.] This regulation was approved in Clearview Apartment Co., 25 T.C. 246, where although the indebtedness in question *305 was secured by mortgages on real property, it was held ineligible as borrowed capital because not incurred for bona fide business purposes. We conclude from the foregoing that the statutory construction sought by Mel Dar must be rejected. We turn now to the question of whether the Jameson indebtedness was in fact incurred in good faith for the purposes of Mel Dar's business. This nonpersonal liability obligation was originally incurred by Mel Dar Company in 1934, and in 1938 Burnett was substituted as principal. It became an indebtedness of Mel Dar on June 1, 1950, when along with other shares, the pledged stock securing it was transferred from Burnett as above noted. The note was not carried on Mel Dar's books as an indebtedness, nor were the encumbered shares listed as an asset. It is clear that no business purpose can be related to the economic value of the mortgaged shares. The quoted price for unencumbered shares of Cement on the San Francisco Stock Exchange was $5 and all other shares of this stock acquired by Mel Dar on June 1 and June 5, 1950, were carried on its books at that value. Petitioners have failed to prove any higher figure, thus the unencumbered value of the mortgaged *306 shares was only about one-half of the indebtedness. In addition, the dividends on this mortgaged stock were payable to the Jameson Corporation; thus, Mel Dar received neither a valuable equity nor property productive of income. Mel Dar next contends that the business purpose for its acquisition of the stock was to acquire control of Cement. But the purpose of the Jameson loan when originally made in 1934 was to assure continued control of Cement by Burnett, and this was effectively accomplished at that time. In June 1950 Mel Dar acquired 106,724 of the 188,164 outstanding shares of Cement. It purchased in addition 212 shares, 806 shares and 2,326 shares in its fiscal years 1951, 1952, and 1953, thus, absent the 16,208 mortgaged shares, it would never have owned a full 50 per cent of the outstanding shares. But we cannot simply assume that 50 per cent ownership or any other given percentage was necessary to control. Petitioners have failed to show that a loss of 16,208 shares would in fact spell the end of control over Cement by the Burnett interests. There is no showing that de facto control of Cement required an actual majority of outstanding shares, or that the Burnetts, individually, *307 did not hold sufficient shares in Cement to offset any loss of control resulting from loss fo the 16,208 shares in question. In summary, we hold that respondent did not err in excluding the Jameson note. 3. Inadmissible Asset Ratio In computing the ratio of inadmissible assets to total assets respondent used book values. Petitioners contend that he erred in failing to use instead the adjusted bases of the assets involved. Section 440 of the Internal Revenue Code of 1939 reads in part as follows: "SEC. 440. ADMISSIBLE AND INADMISSIBLE ASSETS. * * *
"(b) Ratio of Inadmissibles to Total Assets. - In the case of any amount which is required to be reduced by reference to this subsection, the reduction shall be the same percentage of such amount as the percentage which the total of the inadmissible assets is of the total of admissible and inadmissible assets. For such purposes, the amount attributable to each asset held at any time during such taxable year shall be determined by ascertaining the adjusted basis thereof (or, in the case of money, the amount thereof) for each day of such taxable year so held and adding such daily amounts. The determination of such daily amounts shall be made *308 as of the beginning of each day under regulations prescribed by the Secretary. The adjusted basis shall be the adjusted basis for determining gain upon sale or exchange as determined under section 113." We think it clear from the foregoing that petitioners are correct. Respondent does not seem to argue this point on brief, but merely states that the question has been resolved by stipulation. That part of the stipulation to which respondent refers only lists the book values and adjusted bases for the Cement stock held by Mel Dar, but does not indicate which set of values is appropriate. As already noted, we hold that only adjusted basis is proper. Issue 9. Net Operating Loss Carryover In computing a tentative net operating loss for 1951 available as a carryover to later taxable years, respondent has reduced such loss by the excess of percentage over cost depletion. Petitioners challenge the correctness of this adjustment. Section 23(s) of the Internal Revenue Code of 1939 provides as follows: "SEC. 23. DEDUCTIONS FROM GROSS INCOME. "In computing net income there shall be allowed as deductions: * * *
"(s) Net Operating Loss Deduction. - For any taxable year beginning after December 31, *309 1939, the net operating loss deduction computed under section 122." Section 122 thereof reads in part as follows: "SEC. 122. NET OPERATING LOSS DEDUCTION. "(a) Definition of Net Operating Loss. - As used in this section, the term 'net operating loss' means the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d). * * *
"(d) Exceptions, Additions, and Limitations. - The exceptions, additions, and limitations referred to in subsections (a), (b), and (c) shall be as follows: "(1) The deduction for depletion shall not exceed the amount which would be allowable if computed without reference to discovery value or to percentage depletion under section 114(b)(2), (3), or (4); * * *" The most casual reading of the above makes it clear that in computing the net operating loss deduction in the tax year the loss of the loss year must be reduced by the excess of the percentage depletion deduction in that year over cost depletion. It may be that petitioners have misunderstood respondent's action, since they state on brief that in computing the carryover from fiscal 1951 (the loss year) to fiscal 1952 (the *310 first tax year) he reduced the amount available as such carryover by the excess of percentage over cost depletion for fiscal 1952, the tax year. This would be erroneous, since the elimination of the excess depletion deduction, as well as various other adjustments required by section 122(d), referable solely to the net operating loss deduction, necessarily refers to adjustments to the loss year, not the tax year to which the loss is to be carried over. The purpose of such adjustments is to eliminate from the computation of the amount of loss in the loss year, factors not reflective of true economic losses or expenses. Respondent's brief in answer seems to indicate that he reduced the loss by the excess depletion deduction of the loss year only. This adjustment is clearly warranted by section 122(d). To the extent there seems to be some doubt as to what respondent actually did, our foregoing discussion notes what we consider the proper method of computation. Issue 10. Statute of Limitations On March 3, 1957, the Burnetts executed a Form 872 extending to June 30, 1958, the period of assessment with respect to their taxable year 1951, but without admitting applicability of any period *311 of limitation longer than the usual 3-year period. The deficiency notice for 1951 was mailed September 19, 1957. Both sides seem to agree that (1) any deficiency for 1951 is barred if the 3-year period of limitation found in section 275(a) of the Internal Revenue Code of 1939[4] governs, and (2) deficiency is not barred if the 5-year period of section 275(c) of that Code [5] applies. We cannot say with absolute certainty at this time whether Burnett's gross *312 income for 1951 as determined by our opinion on the various issues herein will exceed that reported on his return by an amount in excess of 25 per cent of the latter figure. However, we have determined that Burnett received additional oil income, and it appears at least likely that his gross income as finally computed under Rule 50 will substantially exceed that reported by him. Thus, applicability of the 5-year statutory period must await the final results of the Rule 50 recomputation. Burnett urges further, however, that even if the amount of his gross income as finally determined exceeds that reported by him by more than 25 per cent, the extended period of limitation is inapplicable, citing Colony, Inc. v. Commissioner, 357 U.S. 28, and Lawrence v. Commissioner, 258 F. 2d 562 (C.A. 9), reversing 27 T.C. 713. In the Colony case the taxpayer had correctly reported gross receipts, but had understated gross profits, i.e., gross income from sales of real property, as the result of an overstatement of basis. The Supreme Court, relying on the legislative history of section 275(c), held the 5-year period inapplicable on the ground that Congress intended it to apply to an omission of *313 an item of gross income rather than an understatement resulting from an inaccurate computation. The purpose of Congress was to give the Commissioner an additional 2 years to investigate returns, when, because of such omission, the return itself provided no clue, placing respondent at a special disadvantage. The facts in the Lawrence case clearly satisfied the Colony rule. The Court of Appeals, relying on the Colony case, held the 3-year statute applicable, after thus describing the issue: "When a taxpayer has made a full disclosure of his 'position' with respect to his gross income on his income tax return (a disclosure that would arrest the attention of the Internal Revenue Service upon its examination of the return), but has not 'included' the amount involved as taxable, is the Collector of Internal Revenue subject to the ordinary three year limitation of § 275(a) or to the special five year statute, § 275(c), of the Internal Revenue Code of 1939?" Respondent does not question the authority of the foregoing, but challenges its applicability to the facts here. He notes, correctly, as we think, that nowhere in Burnett's 1951 return is reference made to the oil income matter. Burnett *314 does not deny that his 1951 return is silent in this respect, but seeks to rely on a combination of disclosures in Mel Dar's return for its fiscal year ending April 30, 1952, and actual knowledge on the part of respondent that Burnett and Mel Dar were related taxpayers. Thus, he argues on brief as follows: "1. The Commissioner knew that Mel Dar and the Burnetts were related taxpayers engaged in an oil operation in Shamrock. "2. By Mel Dar's Return for fiscal year ended April 30, 1952 the substance of the agreement between the parties relating to realization of income by each was set forth. * * * "3. The Commissioner knew all of the facts he now relies upon as of October 18, 1954 when the agent prepared his report he issued his notice of deficiencies in re Mel Dar. * * *" And in the reply brief the following appears: "Respondent asserts that the Burnetts' 1951 Return * * * 'on its face provided no clude to the existence of the omitted item' * * *. Respondent carefully avoids a denial that he knew the facts he now relies upon as of October 18, 1954, six months prior to the time the 3-year statute ran * * *." We think petitioners seek here an unwarranted extension of the Colony rule. *315 That rule is limited to the case where the return in question in and of itself makes the necessary disclosure. Its ratio decidendi, that Congress intended an omission rather than a mere understatement of an item, permits no broader application. Respondent is under no duty to a taxpayer to cross-reference his returns with those of other, even though related, taxpayers. And one such taxpayer may not appropriate to his own benefit matters contained in the return of another any more than could respondent tax to one taxpayer income factually and legally earned by the other. Moreover, under petitioners' theory, respondent would enjoy even less than the basic 3-year period during which he might intelligently investigate the matter. Mel Dar's return for its fiscal year ending April 30, 1952, containing the "disclosure" relied upon, was due and filed on July 15, 1952, while Burnett's 1951 return was due March 15 and filed March 17, 1952. By the interaction of sections 275(a) and (c), respondent is afforded 3 years in which to investigate understatements of income with respect to which the return itself affords a clue, and 5 years in which to ferret out and bring to light those items which were *316 not so divulged. Burnett here seeks to restrict respondent to something less than either of the foregoing. Were Burnett here relying solely on the "disclosure" in Mel Dar's 1952 return, he would in effect, be asking the Court to limit respondent to 4 months of "blind" and 32 months of "sighted" investigation. Manifestly, this is less than either (1) 3 full years during which respondent is on notice of the item in question, or (2) 5 years. Burnett would go even further, however, in that he seeks to rely on a combination of that "disclosure" plus actual knowledge on respondent's part as of October 18, 1954. Under this theory, respondent has 31 months of "blind" and 5 months of "sighted" investigation. Neither position is tenable. As originally filed, Burnett's return clearly requires the application of section 275(c) under any theory. Petitioners seek to eliminate such application retroactively by relying upon the return of another taxpayer filed 4 months thereafter (and/or knowledge on respondent's part 2 1/2 years thereafter). So to state their contention is to reject it. Decisions will be entered under Rule 50. Footnotes
1. Petitioners in their brief erroneously refer to this deduction as one claimed in the fiscal year ending April 30, 1953.↩
2. There is no explanation as to why this figure which excludes the $572.66 charged to and paid by Burnett on December 29, 1952, is used here, whereas the analysis in the reply brief, as will appear infra, included the latter amount. Nor are we informed as to why in their return the Burnetts sought a deduction in the amount only of $34,900.39 ($35,064.88 minus the car expense of $164.49), thus ignoring and seeking no deduction for payment of the amount allocated to them on December 29.
3. SEC. 439. BORROWED CAPITAL. (a) Average Borrowed Capital. - For the purposes of this subchapter, the average borrowed capital for any taxable year shall be the aggregate of the daily borrowed capital for each day of such taxable year, divided by the number of days in such taxable year. (b) Daily Borrowed Capital. - For the purposes of this subchapter, the daily borrowed capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following: (1) The amount of the outstanding indebtedness (not including interest) of the taxpayer, incurred in good faith for the purposes of the business, which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, deed of trust, bank loan agreement, or conditional sales contract. In the case of property of the taxpayer subject to a mortgage or other lien, the amount of indebtedness secured by such mortgage or lien shall be considered as an indebtedness of the taxpayer whether or not the taxpayer assumed or agreed to pay such indebtedness, * * *↩
4. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - (a) General Rule. - The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period. * * *↩
5. (c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.↩